# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>RENT-A-CENTER EAST, INC.,<br><br>    Defendant. | Case No. 16-cv-2222<br><br>Judge Bruce<br><br>Magistrate Judge Long |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

When he learned about Megan Kerr's gender transition, Rent-A-Center ("RAC") district manager Jason Carnahan told Kerr's store manager, Russell Kasper, that he disapproved of it and that he did not want someone "like that" (i.e., someone transgender) working in the store. Carnahan told Kasper to find a basis for firing her and to make sure to document it. Carnahan checked up on the status of this effort periodically over next several months. Kasper, however, did not go along with this plan because he thought it was illegal. So Carnahan fired Kasper and replaced him with Jason Morris. Morris did just what Carnahan had repeatedly asked Kasper to do. After giving Kerr permission to make a delivery to a customer on a Sunday using a RAC delivery truck, Morris documented the fact that the truck was in use that Sunday, reported it to Carnahan the same day, and they agreed to fire Kerr for using the delivery vehicle on a Sunday, which was a violation of company policy. While RAC maintains that Kerr was fired for personal use of the company vehicle, which it says "automatically" results in termination, there is evidence that other employees violating the same policy were not fired.

This is a classic pretext case.  While there is no dispute that Kerr[1] used the delivery truck on the Sunday in question, the evidence shows that is not the real reason she was fired.  Rather, it was merely a pretext for unlawful sex discrimination.

RAC's arguments focus on facts that are both disputed and immaterial and thus do not provide a basis for summary judgment.

Because there are genuine disputes about the material facts in this case, Plaintiff U.S. Equal Employment Opportunity Commission ("EEOC") respectfully requests that RAC's motion for summary judgment be denied.

## RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

### A.    Undisputed Material Facts

The following facts stated in the Motion are material and undisputed, except as noted below:

1.

2.

3.

4.

5.

6.

8.

9.

10.

11.    This is undisputed and material, except the portion of the statement that says the

---

[1] Kerr's last name is now Vanna.  The EEOC refers to her as Kerr throughout this motion because that is the name that appears throughout the record and is known to witnesses.

delivery was "in connection with a project of a local civic organization" which is immaterial and disputed.  The evidence obtained in discovery shows it is more precise to say that the rest of the customer's move was conducted by *members* of a local civic organization.  Exh. A, Shumate Dep., pp. 108:1-109:19; *but see also id.* at pp. 14:15-15:2 ("it was his Mason Lodge that helped").

12.

15.

36.

40.     It is material that Shumate purchased the merchandise from RAC, but it is immaterial who actually paid for the purchase.

52.

54.

56.

## B.     <u>Disputed Material Facts</u>

The following facts stated in the Motion are material and disputed, except as noted below:

7.     Undisputed as to the first sentence.  As to the second sentence, disputed: Carnahan also told Kasper to "do whatever it takes" to find a way to fire Megan Kerr, and instructed Kasper to find infractions to document and to make sure that "it's not just little things."  Exh. C, Kasper Dep. pp. 35:5-11, 142:10-20; Exh. F, Kasper Declaration ¶ 7.

## C.     <u>Disputed Immaterial Facts</u>

"Material facts are only those facts which bear directly on the legal issue raised by the motion." LR 7.1(D)(1)(b).  "As to materiality, the substantive law will identify which facts are

material.  Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant

or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

This case turns on whether Kerr used the RAC delivery truck or for personal reasons (as RAC

contends) or for a customer delivery with the approval of her store manager (as the EEOC

contends), and whether RAC's alleged legitimate non-discriminatory reason for terminating Kerr

is actually a pretext for sex discrimination.  Many of RAC's facts do not bear, even indirectly, on

these issues.

The following facts stated in the Motion are immaterial and disputed, except as noted

below:

13.     The asserted fact does not accurately describe the interrogatory, which asked

generally about deliveries and pickups to civic organizations and not about the delivery to Amber

Shumate.  The asserted fact is immaterial because even if RAC never made use of the delivery

truck on Sundays in the past, the material issues pertain to the July 20, 2014 delivery, whether

Morris authorized it, and whether it was what motivated the decision to discharge Kerr.

17.     Shumate testifies that Kerr was there when Shumate purchased the merchandise.

RAC Exh. 5, Shumate Dep., p. 8:4-23; and RAC Exh. 6, Shumate Receipt (RAC 000523).  This

fact is immaterial because the jury does not need to make a determination as to whether Kerr was

at the store at the time Shumate purchased the merchandise to find for the EEOC.

19.     Kasper was no longer the store manager when Shumate purchased the furniture.

*Compare* RAC Exh. 6, Shumate Receipt (RAC 000523) *with* RAC Exh. 1, Kasper Dep., p. 7:22-

24.  Also, the asserted fact is not an accurate depiction of the testimony.  Kerr never mentions

that this agreement occurred at the time of Shumate's purchase, only that there was a previous

agreement between Shumate and RAC/Kasper, and that Kerr volunteered to move the RAC merchandise.  Nonetheless, this fact is immaterial because the jury does not need to make a determination as to whether Kasper or someone else made this commitment to Shumate.

20.     Shumate testified that the merchandise was in the garage of Shumate's mother-in-law.  RAC Exh. 5, Shumate Dep., pp. 41:13-42:6.  Also, the asserted fact is not an accurate reflection of the testimony.  In the cited testimony, Kerr agreed that the mini-storage facility was "something like" that described by RAC's counsel, not that that is what it was.  This fact is also immaterial because the jury does not need to make a determination as to whether the merchandise was moved from residential or commercial storage to make a finding about RAC's motive in firing Kerr.

23.     See the EEOC's response to Defendant Statement of Fact (DSF) Nos. 19 and 20. This is not an accurate depiction of the testimony.  In the cited testimony, RAC's counsel asked when Shumate purchased the furniture, to which Kerr responded she did not know.  No question was asked within this deposition citation about why the furniture was in a commercial rather than residential storage.

25.     See the EEOC's response to DSF No. 19.

27.     See the EEOC's response to DSF No. 19.  Additionally, this fact does not make sense as written.  This portion of the testimony does not state that Kasper alerted Kerr when Shumate was ready to take possession of the furniture.  To the extent the asserted fact is that Kasper told Kerr that Kerr delivered the furniture or told Kerr why Kerr did so, there is no evidence to support that.  Kasper had been fired months earlier.  See DSF No. 9.

34.     It is unnecessary for the jury to decide how many of the individuals assisting with the rest of Shumate's move were members of a Masons lodge in order to decide whether RAC

discharged Kerr because of her gender identity.  The fact is also disputed to the extent it suggests no Masons were present: Kerr testified that Russell Wiedemann was a Mason who was assisting with the move, and Shumate testified that several members of a Masonic lodge were there.  Exh. B, Kerr Dep., p. 39:19-22; Exh. A, Shumate Dep., p. 108:1-109:19 ("four or five" members of Masonic lodge present).

37.     The cited document is an "Adjudication Summary" and thus is a document prepared by the Illinois Department of Employment Security ("IDES"), not by Megan Kerr, and so the statements that are summarized here are (at least) double hearsay.  RAC Exh. 4, p. RAC000415.  What Kerr told IDES (and whether IDES summarized it accurately) goes, at most, to credibility and is not itself material.  The jury need not decide what occurred during an IDES interview, but rather must decide what happened at RAC in 2014 and what RAC's motive was in discharging Kerr.

41.     There is evidence to the contrary.  Exh. C, Kasper Dep., p. 64:5-12 (Kasper recognized Shumate as being a RAC customer).  However it is unnecessary for a jury to decide whether Kasper and Shumate were acquainted or not in order to decide whether Kerr's gender identity motivated Carnahan's decision to discharge her, and so this is immaterial.

42.     In the cited deposition testimony, Shumate does not state that she has never spoken to Kasper.  She instead testifies that she never made an agreement with him about moving the furniture.  The latter half of this fact is also a misrepresentation of the testimony. Directly after this deposition passage, Shumate qualifies her earlier testimony and testifies that if Kerr mentioned Kasper, she does not remember it.  Exh. A, Shumate Dep., p. 48:16-17.  Whether or not Shumate remembers or knows Kasper is, in any event, immaterial.

44.     This is disputed.  Kerr testified that she did not make the original delivery of the

furniture to Shumate's home in Rankin.  Exh. B, Kerr Dep., p. 28:12-16.  The asserted fact is immaterial since the delivery at issue in this case, for which RAC contends it discharged Kerr, was the July 20, 2014, delivery, and the delivery referenced in the cited testimony was in February or March 2014.  *See* RAC Exh. 5, p. 41:13-17.

51.     The asserted facts are not supported by the cited evidence.  The asserted facts concern what steps RAC took during discovery to search its 2014 sales records.  The cited evidence (a print out of the relevant sales records) does not discuss what steps RAC took in discovery.  The asserted facts are also immaterial because it is not essential for the jury to make any determinations about what steps RAC took during discovery.

55.     The asserted fact is not supported by the cited testimony, which consists of a compound question to which the EEOC timely objected; it is unclear what part of RAC's question Kasper's testimony is addressed to.  Kasper's "absolutely not" seems to be more about the Masons than about the agreement based on the next two sentences of his testimony.  In any event, the asserted fact is immaterial because the jury does not need to make a determination as to whether it was Kasper or someone else who made this commitment to Shumate.

57.     To the extent RAC is equating using a RAC truck to "us[ing] company property for any charitable event" the EEOC disputes this fact.  The full context of Kasper's testimony clearly indicates he is referring to merchandise and not the usage of a RAC vehicle.  Exh. C, Kasper Dep., pp. 174:13-175:10.  Kasper also testified he used the RAC truck on Sundays to pick-up merchandise.  Exh. C, Kasper Dep., pp. 12:25-13:25.  The asserted fact is immaterial, in any event, because the EEOC's claim is not about RAC donating merchandise.

62.     RAC misstates Kasper's testimony.  Kasper stated that Kerr was not involved in any of the Sunday pickups that he described earlier in his deposition, and not that Kerr was never

involved in any Sunday pickup or delivery.  RAC Exh. 1, Kasper Dep., p. 19:5-8; and Exh. C, Kasper Dep., pp. 12:25-13:25.

64.      Wiedemann, a Mason, was involved in the Shumate move.  Shumate and Kerr testified that they thought the others helping that day were Masons because of their association with Wiedemann. Exh. A, Shumate Dep., pp. 14:19-15:8; Exh. B, Kerr Dep., p. 56:4-10.  This is an immaterial fact because whether this was an officially-sanctioned service project of the Mason's lodge or not has no bearing on whether Morris gave Kerr permission to make the Sunday delivery.

66.      Shumate testified that she recognized the other helpers as Wiedemann's Masonic friends.  Exh. A, Shumate Dep., pp. 14:19-15:8.  As discussed in response to DSF Nos. 34 & 64, whether and how many Masons were involved in the move is immaterial.

67.      See responses to DSF Nos. 64 & 66 regarding the Masons' participation in the move.  The EEOC also disputes that Kerr used the truck to move anything other than the RAC merchandise.  Exh. A, Shumate Dep., p. 14:12-14; Exh. B, Kerr Dep., p. 223:4-6.  Also, the cited deposition testimony makes no mention of whether or not the Shumate move was a Mason-sponsored event.

### D.      Undisputed Immaterial Facts

The following facts stated in the Motion are immaterial and undisputed, except as noted below:

14.      Undisputed that this is the EEOC's supplemental interrogatory response.  To the extent the asserted fact is intended to critique word choices based on information later obtained in discovery, that is not a material issue.  A record disclosed by RAC subsequent to this interrogatory response indicates that Shumate paid for the furniture herself, *see* RAC Exh. 6, but

that, too, is not material to the claim that Kerr's discharge was sex discrimination, *see, e.g.*, response to DSF No. 40.

16.    In 2014, Shumate and Kerr were merely acquaintances, and as of the spring of 2014 had only met briefly on two occasions for about five minutes.  Exh. A, Shumate Dep., pp. 23:5-8, 23:18-22.  This fact is immaterial because it is not necessary for the jury to make a finding as to the nature of Shumate and Kerr's relationship.

18.    How Kerr and Shumate met is immaterial because it has no bearing on the legal issues raised by RAC's Motion.

21.    Whether the merchandise was in storage at a garage or other type of storage facility is immaterial to whether Morris authorized the use of the truck on July 20, 2014, and whether that was a pretext for sex discrimination.

22.    The specific RAC merchandise Shumate purchased is immaterial.

24.    Who made the initial delivery of the RAC merchandise to Shumate in the spring of 2014 is immaterial.

26.    The EEOC does not dispute Kerr stated this, but this is immaterial to the issue of whether Morris authorized the use of the truck on July 20, 2014, and whether that was a pretext for sex discrimination.

28.    Undisputed except that Kerr also testified that she does not know whether Wiedemann or Shumate made the arrangements with Kasper.  Exh. B, Kerr Dep., p. 22:15-19 ("Again, I'm not aware of the entire transaction that enacted between all that [sic].").  Regardless, this is immaterial to whether Morris authorized the use of the truck on July 20, 2014, and whether that was a pretext for sex discrimination.

29.    The EEOC does not dispute that Kerr stated this.  However, whether the storage

was a residential or commercial unit is immaterial.

30.     The number of people helping Shumate move is immaterial.

31.     The Masons' participation in the move (and, by extension, Kerr's understanding about that) is immaterial.  Kerr also testified that the move occurred on Sunday because of scheduling needs.  Kerr also testified that these are merely her assumptions, and that she never discussed it or was told by anyone explicitly that this was the case.  Exh. B, Kerr Dep., pp. 55:9-57:20.

32.     This is a recitation of testimony and not a statement of fact, and so it is immaterial.  It is not disputed that the statement correctly recites Kerr's deposition testimony.

33.     How long Kerr spent making the delivery, and her recollection of other helpers, is immaterial.

35.     Immaterial for the reasons stated in response to DSF Nos. 31, 34.

38.     The cited exhibit does not support the assertion that these questionnaires were signed under oath.  Assuming that Kerr filled these out,  Kerr's representation to the IDES is in any event immaterial to whether Morris authorized the use of the truck on July 20, 2014, and whether that was a pretext for sex discrimination.  The EEOC also notes that facts recounted in the responses described this statement of fact are consistent with the EEOC's claim in this case.

39.     See response to DSF No. 38.  Additionally, Kerr's response that she volunteered at an event her store manager scheduled (i.e. gave her permission to do) and came back to work to be fired is consistent with the EEOC's claim in this case.

43.     Immaterial for the reasons stated in response to DSF No. 21.

45.     Immaterial for the reasons stated in response to DSF No. 21.

46.     Shumate's ability, or inability, to explain another witness's testimony is

immaterial.

47.     This is an immaterial fact because whether this was an officially-sanctioned Masonic event or not has no bearing on whether Morris gave Kerr permission to make the Sunday delivery and whether RAC's stated non-discriminatory reason for firing Kerr is pretext.

48.     The circumstances of Shumate's relocation and move to a new residence are immaterial.

49.     Immaterial for the reasons stated in response to DSF No. 47.

50.     Immaterial for the reasons stated in response to DSF No. 47.  Shumate also testifies that it has been too long to remember the names of any other Masons who helped with the move.  Exh. A, Shumate Dep., p. 65:16-19.

53.     A misspelled name is not a material fact.

58.     This is immaterial because it is not necessary for the jury to determine what Kasper's view was of what constitutes a "terminable offense."

59.     Kasper's knowledge about an event seven months after his termination is immaterial. See also response to DSF No. 47.

60.     Immaterial for the reasons stated in response to DSF No. 58.

61.     Immaterial for the reasons stated in response to DSF No. 59.

63.     Immaterial for the reasons stated in response to DSF No. 47.

65.     Immaterial for the reasons stated in response to DSF No. 47.

**E.**     **Additional Material Facts**

1.     Megan Kerr is transgender.  That is, her gender identity (female) is different from the sex she was designated at birth (male).  Exh. D, Amended Answer [ECF No. 21], ¶ 14(c).

2.     Prior to March 2013, Kerr presented as male and had a traditionally male first

name.  Kerr informed RAC in March 2013 that she was changing her name and gender
presentation.  Exh. D, Amended Answer ¶ 14(d)-(e).

      3.      Both before and after her transition, Kerr was meeting RAC's expectations; by the
time of her transition, she had worked for RAC for eight years, she did her job and RAC did not
have any issues with her.  Exh. E, Leavengood Dep., p. 43:5-10; Exh. H, Morris Dep., pp. 94:24-
95:6; DSF No. 1.

      4.      After Store Manager Russell Kasper told District Manager Jason Carnahan in
March 2013 about Megan Kerr's gender transition, Carnahan told Kasper that he disapproved of
Kerr's gender transition and did not approve of having a transgender employee in the store.  Exh.
F, Kasper Declaration ¶ 7 ("Carnahan told me that he did not approve of having someone like
that in the store, or of the way she was changing and dressing."); Exh. C, Kasper Dep., pp.
121:16-21, 137:20-138:5, 172:5-10.

      5.      District Manager Carnahan also told Store Manager Kasper, in March 2013, to
"do whatever it takes" to find a way to fire Megan Kerr, and instructed Kasper to find infractions
to document and to make sure that "it's not just little things."  Exh. C, Kasper Dep. pp. 35:5-11,
142:10-20; Exh. F, Kasper Declaration ¶ 7 ("Carnahan told me to do whatever it takes to find a
way to fire Ms. Kerr or get her to quit.  He told me to find infractions to document in order to
create a basis for terminating Ms. Kerr....").

      6.      For the next several months, until December 2013, Carnahan continued to
pressure Kasper to come up with a basis for firing Kerr, following up with Kasper roughly
weekly to check on the status of that effort.  Exh. C, Kasper Dep., pp. 44:5-17, 142:24-143:8,
145:23-146:5.

      7.      Kasper did not believe it was lawful to discriminate against Kerr because of her

gender transition, and he did not cooperate with Carnahan's instruction to find a basis for firing

Kerr because he thought it was illegal.  Exh. C, Kasper Dep., pp. 57:17-58:1, 145:23-146:5; Exh.

F, Kasper Declaration ¶¶ 9, 11.

8.      Carnahan fired Kasper in December 2013, after giving Kasper a performance plan

that gave him just three days to increase store sales by 57%.  Exh. G, Carnahan Dep., pp. 57:1-

58:10.

9.      In February 2014, Carnahan hired Jason Morris to be the new store manager for

the Rantoul store, replacing Kasper.  Exh. G, Carnahan Dep., p. 64:15-22; Exh. H, Morris Dep.,

p. 12:1-4.

10.      RAC managers, including former store manager Kasper, occasionally used the

RAC truck to move merchandise on Sundays, for example to retrieve rented freezers when

weekend events ended on a Sunday.  Exh. C, Kasper Dep., pp. 12:25-13:25; Exh. B, Kerr Dep.,

p. 41:13-43:4.

11.      A Sunday, July 20, 2014, delivery for Amber Shumate had been put on the store's

delivery schedule sometime prior to that date.  Exh. B, Kerr Dep., p. 48:9-13.

12.      Approximately a week beforehand, Jason Morris knew about the scheduled

Sunday, July 20, 2014 delivery, okayed it, and on Saturday, July 19, 2014, gave Kerr the keys to

the RAC vehicle the night before the delivery.  Exh. B, Kerr Dep., pp. 48:9-49:20.

13.      Morris now contends that he did not approve the Sunday, July 20, 2014 delivery

but nevertheless had a "suspicion" that Kerr might be using the vehicle that Sunday, which, he

says, prompted him to visit the store that Sunday to check on the RAC vehicles.  Exh. J, Morris

Declaration ¶ 7.

14.      On Sunday, July 20, 2014, Morris went to the store, took a date-stamped picture

of the parking lot to "document" that one of the RAC delivery vehicles was not there, and called

Carnahan. During that phone call, Carnahan and Morris "both agreed that Ms. Kerr should be

terminated for violating Company policy (i.e., using a company vehicle for personal reasons)."

Exh. I, Carnahan Declaration ¶ 8; Exh. J, Morris Declaration ¶ 8.

15.     Morris maintains that first thing on Monday morning, July 21, 2014, he asked

Kerr whether she had used a RAC vehicle the day before to move "her belongings from her place

of residence to a new location," and, according to Morris, Kerr freely told Morris that she had

done so. Exh. J, Morris Declaration ¶ 10; Exh. H, Morris Dep., pp. 99:14-100:2.

16.     In reality, on Sunday, July 20, 2014, Kerr was using the RAC delivery vehicle to

make the previously-scheduled delivery for a customer, Amber Shumate — the delivery that

Morris himself had been approved the day before. Exh. B, Kerr Dep., p. 18:15-19;[2] Exh. A,

Shumate Dep., p. 13:8-14.

17.     With Jason Carnahan's approval, Jason Morris carried out Kerr's discharge on

Monday, July 21, 2014. Exh. H, Morris Dep., p.. 99:14-100:1; Exh. I, Carnahan Declaration ¶ 8.

18.     On the Monday Kerr was fired, Morris simply informed her that RAC was firing

her for "what had happened on Sunday." Exh. B, Kerr Dep., pp. 17:1-2, 17:20-18:6.

19.     Morris and Carnahan maintain that Kerr was terminated for improper use of the

RAC delivery vehicle, because they say that Kerr used the vehicle to move her own personal

belongings. Exh. G, Carnahan Dep., pp. 96:18-97:8; Exh. H, Morris Dep., pp. 86:10-14, 87:8-

89:18; Exh. J, Morris Declaration ¶¶ 7-8; Exh. I, Carnahan Declaration ¶ 8.

20.     During a phone call that lasted "[a] couple of minutes" RAC regional director

David Leavengood also signed off on Kerr's discharge, but in doing so Leavengood merely

---

[2] The cited deposition question incorrectly references the date as August 13, 2014, rather than
July 20, 2014. By August 13, 2014, Kerr was no longer employed by RAC. DSF No. 1.

relied upon information provided to him by Carnahan, telling Carnahan to "inquire about it, but if it was true, that it was a termination."  Leavengood asked no questions and provided no other suggestions or instructions as to how to proceed.  Leavengood did not talk to Carnahan again about Kerr until after she had been fired.  Exh. G, Carnahan Dep., pp. 81:8-83:15; Exh. E, Leavengood Dep., pp. 30:20-32:24.

21.    RAC's "Coworker Handbook" contains a policy that prohibits store employees from "[u]sing Company property (including company vehicle) for personal use."  Exh. H, Morris Dep., pp. 117:23-118:10 & Dep. Exh. 2; Exh. G, Carnahan Dep., pp. 47:19-48:7.

22.    RAC and its managers maintain that an employee's improper use of a RAC vehicle in violation of this policy "automatically" results in the employee's termination, with "no exceptions."  Exh. G, Carnahan Dep., p. 47:1-14.  Thus, according to RAC, if an employee uses a RAC vehicle to drive a coworker to attend to personal business, that is an "automatically terminable offense" and that employee would need to be terminated.  *Id*., pp. 107:23-108:10.

23.    However, Matthew Hawley, another RAC store employee supervised by Morris, used a RAC truck to drop off a coworker, Gregory Cannon, at a recording studio where Cannon was recording an album.  Although Morris knew this was improper use of a RAC vehicle by Hawley, Hawley was not fired.  Instead, Hawley got "at best ... probably [a] verbal [warning]." Exh. K, RAC Response to Interrogatory No. 11 (Hawley "was not terminated at the time of the incident involving Mr. Cannon...."); Exh H, Morris Dep., pp. 103:21-106:8.

24.    Morris and RAC have stated that Hawley received a verbal warning instead of being fired for personal use of the RAC vehicle because "he did the right thing and told us about it" and "took responsibility for his actions." Exh. H, Morris Dep., p. 106:3-8; Exh. K, RAC Response to Interrogatory No. 11.

25.     Another RAC store employee at the Rantoul store, Michael Moreland, went with a coworker on a personal errand to a Harley Davidson store, using a RAC vehicle.  Although RAC was aware of the incident, only the coworker was fired for it.  Moreland was not disciplined at all, and instead RAC simply permitted his previously-announced resignation to take effect.  Exh. L, Harding Dep., pp. 8:2-19, 11:22-13:1; Exh. M, RAC Response to Interrogatory No. 10.

26.     Hawley and Moreland are not transgender; Kerr was the only transgender employee known to RAC in the district that encompasses the Rantoul store.  Exh. G, Carnahan Dep., p. 78:2-5, 78:16-19; Exh. E, Leavengood Dep., p. 43:21-44:1.

27.     During this litigation, a private investigator working on behalf of RAC visited the home of a key witness, Amber Shumate, acted in an "aggressive" and "domineering" manner, refused to leave her home when asked, scared her, tried to cause her to change her testimony in this matter, and left her in tears.  Exh. A, Shumate Dep., pp. 15:19-21:11.  This affected Shumate's willingness to testify in this case, making her unwilling to participate for a time, although she did ultimately comply with a deposition subpoena.  *Id*. 21:8-24.

28.     On April 24, 2017, RAC represented to the court that "there are enough fact issues in the case [that] it doesn't make sense to file a motion for summary judgment." Exh. N, April 24, 2017, hearing transcript, p. 3:23-24.

## ARGUMENT

### A.      Legal Standard for Summary Judgment

"The question on summary judgment is whether defendants showed that there is no 'genuine dispute as to any material fact' and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a)." *Cole v. Bd. of Trustees of N. Illinois Univ.,* 838 F.3d 888, 895 (7th Cir. 2016).  The Court must resolve "all factual disputes and draw all reasonable inferences in favor of … the non-moving party." *Woods v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015).  The critical question is simply "whether a reasonable jury could infer prohibited discrimination." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 703 (7th Cir. 2013).

### B.      Sex Discrimination Under Title VII Encompasses Discrimination Because of an Employee's Gender Transition or Transgender Status

Discrimination against an employee because she is transgender, or because she has transitioned from male to female, is inherently a form of sex discrimination and is thus prohibited by Title VII.  In *Price Waterhouse v. Hopkins*, the Supreme Court explained that Title VII's broad and clear prohibition of discrimination because of sex "mean[s] that gender must be irrelevant to employment decisions."  490 U.S. 228, 240 (1989).  The Court explained that Title VII broadly prohibits employment decisions that "take gender into account" or which rely upon "sex-based considerations." *See id.* at 241-42 (to support sex discrimination claim, plaintiff need only "prove that the employer relied upon *sex-based considerations* in coming to its decision") (emphasis added));  *id.* at 239 (Title VII forbids employers to "take gender into account").  In discharging an employee because she identifies as female or because she previously presented as male, an employer necessarily takes gender into account.  And a person's transgender status is plainly a sex-based consideration because it refers, by definition, to the fact that one's gender identity is different from the sex he or she was assigned at birth.  *See* PSF No. 1.

1

Case law from the Seventh Circuit and elsewhere supports this conclusion.  In a recent Title IX case, the Seventh Circuit concluded that a boy alleging discrimination "because he is transgender" had a likelihood of success on the merits of his claim of sex discrimination.  *See Whitaker v. Kenosha Unified School District No. 1*, 2017 WL 2331751, *11 (7th Cir. May 30, 2017) ("The School District's policy also subjects [plaintiff], as a transgender student, to different rules, sanctions, and treatment than non-transgender students, in violation of Title IX."); *Fabian v. Hosp. of Central Connecticut*, 172 F.Supp.3d 509, 526 (D. Conn. Mar. 18, 2016) ("[D]iscrimination on the basis of transgender identity is cognizable under Title VII"); *Schroer v. Billington*, 577 F. Supp. 2d 293, 302 (D.D.C. 2008) ("[D]iscrimination on the basis of gender identity is literally discrimination 'because of ... sex.'").

Although several decades ago the Seventh Circuit stated that "Title VII does not protect transsexuals," *Ulane v. Eastern Airlines*, 742 F.2d 1081, 1086 (7th Cir. 1984), that statement is a dead letter.  *Ulane* relied on the assumption that "Congress had a narrow view of sex in mind when it passed the Civil Rights Act" and gave "sex ... a narrow, traditional interpretation, which would ... exclude transsexuals" and limit sex discrimination to "discriminat[ion] against women because they are women and against men because they are men."  *See id*. at 1085-86.  That reasoning is fatally undermined by *Price Waterhouse*, however, in which the Supreme Court "embraced a broad view of Title VII, as Congress 'intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'"  *See Whitaker*, 2017 WL 2331751 at *9 (quoting *Price Waterhouse*, 490 U.S. at 251).  "*By definition*, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth."  *Id*. (emphasis added); *see also Glenn v. Brumby*, 663 F.3d 1312, 1318 n.5 (11th Cir. 2011).  It follows logically that discrimination because a person is transgender is encompassed

2

within the definition of sex discrimination set forth in *Price Waterhouse*.

*Ulane*'s resort to Congressional intent is also in direct conflict with the Supreme Court's unanimous ruling in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998). Holding that same-sex sexual harassment was actionable under Title VII's sex discrimination provision, the Court explained that it was irrelevant that Congress likely had not contemplated the issue in 1964. *See id.* at 79-80 ("[S]tatutory prohibitions often go beyond the principal evil [they were passed to combat] to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").[3]

The "narrower view ... that the word 'sex' simply and only means "male and female,'" is mistaken because "'[m]ale and female ... is not a formulation of meaning, but a list of instances." *See Fabian*, 172 F. Supp. 3d at 526. The court explained:

> "Male or female" is a relatively weak definition of "sex" for the same reason that "A, B, AB, or O" is a relatively weak definition of "blood type": it is not a formulation of meaning, but a list of instances. It might be an exhaustive list, or it might not be, but either way it says nothing about why or how the items in the list are instances of the same thing; and the word "sex" refers not just to the instances, but also to the "thing" that the instances are instances of.

*Id.*

This is consistent with courts' treatment of other forms of discrimination prohibited by

---

[3] The Seventh Circuit, sitting *en banc*, also criticized *Ulane* when it held recently that "discrimination on the basis of sexual orientation is a form of sex discrimination" under Title VII. *See Hively v. Ivy Tech Community College of Indiana*, 853 F.3d 339, 341 (7th Cir. Apr. 4, 2017). Indeed, it noted that the (now-discredited) rejection of sexual orientation coverage could be traced back to *Ulane*'s unduly narrow conception of sex discrimination.

Other courts of appeals are in accord that *Ulane* is incompatible with intervening Supreme Court precedent. The Sixth Circuit has pointedly concluded that "the approach in ... *Ulane* ... has been eviscerated by *Price Waterhouse*." *See Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004); *see also Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000) (approach taken in *Ulane* and other early cases was "overruled by the logic and language of *Price Waterhouse*"); *Glenn*, 663 F.3d at 1318 n.5 (*Ulane*'s "reliance on the presumed intent of Title VII's drafters is ... inconsistent with *Oncale*").

Title VII.  "[N]o court would implicitly define religion as synonymous with a purportedly exhaustive list of religions, and thus [no court could] conclude that discrimination 'because of religion' must be limited to discrimination against members of particular religions on the list because they are such members." *Id.* at 527.  As another district court explained:

> Imagine that an employee is fired because she converts from Christianity to Judaism.  Imagine too that her employer testifies that he harbors no bias toward either Christians or Jews but only "converts." That would be a clear case of discrimination "because of religion." No court would take seriously the notion that "converts" are not covered by the statute.  Discrimination "because of religion" easily encompasses discrimination because of a change of religion.

*Schroer*, 577 F. Supp. at 306.

Applying this analogy to gender identity, both the *Schroer* and *Fabian* courts concluded that discrimination because of sex must include discrimination because of gender identity or a gender transition because those are plainly sex-based considerations:

> Because Christianity and Judaism are understood as examples of religions rather than the definition of religion itself, discrimination against converts, or against those who practice either religion the "wrong" way, is obviously discrimination "because of religion." Similarly, discrimination on the basis of gender stereotypes, or on the basis of being transgender, or intersex, or sexually indeterminate, constitutes discrimination on the basis of the properties or characteristics typically manifested in sum as male and female—and that discrimination is literally discrimination "because of sex."

*Fabian*, 172 F. Supp. 3d at 527; *see also Schroer*, 577 F. Supp. at 308.[4]

In sum, the Supreme Court's authoritative interpretation of sex discrimination encompasses any form of discrimination in which sex is an ingredient in the employer's thinking.  Because Title VII's protections "must extend" to any discrimination that "meets the

---

[4] Such reasoning concerning religious discrimination applies equally to sex discrimination because Title VII "on its face treats each of the enumerated categories" — race, color, religion, sex, and national origin — "exactly the same."  *Price Waterhouse*, 490 U.S. at 243 n.9 ("[O]ur specific references to gender throughout this opinion, and the principles we announce, apply with *equal force* to discrimination based on race, religion, or national origin" (emphasis added)).

statutory requirements," *Oncale*, 523 U.S. at 80, it was sex discrimination to discharge Megan

Kerr because the gender she identifies as is different from the gender she presented as earlier in

her life.  That termination plainly took her sex into account and is therefore sex discrimination.

More generally, the fact that a person is transgender is, by definition, a sex-based consideration.

Kerr is transgender precisely because her gender identity (female) is different than the gender she

was designated at birth (male).  Taking an adverse employment action against her because of that

is necessarily to consider her sex, and that is a violation of Title VII.

**C.      There Are Genuine Disputes of Material Fact That Preclude Summary Judgment**

> **1.  A Reasonable Jury Could Conclude That RAC Discharged Kerr Because of Her Gender Transition and/or Because She Is Transgender**

"[T]here are two ways [a plaintiff] may prove [Title VII] claims:  the 'direct' and

'indirect' methods of proof."  *Perez*, 731 F.3d at 703.  Whether evaluated under the direct or the

indirect method of proof, there is ample evidence to permit a reasonable jury to conclude that

RAC discharged Kerr because she is transgender.

"Under the direct method, the plaintiff must produce either direct or circumstantial

evidence that would permit a jury to infer that discrimination motivated an adverse employment

action."  *Diaz v. Kraft Foods Global, Inc*., 653 F.3d 582, 587 (7th Cir. 2011).  "Direct evidence

is something close to an explicit admission by the employer that a particular decision was

motivated by discrimination."  *Id*.  "[C]ircumstantial evidence ... suggests discrimination albeit

through a longer chain of inferences."  *Id.* (internal quotation marks omitted).  "[U]nder the

indirect method, a plaintiff must satisfy the familiar requirements of" *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792 (1973).  *Perez*, 731 F.3d at 703.

Under each method, however, all of the evidence (direct and circumstantial) must be

considered together.  The Seventh Circuit has rejected "the proposition that evidence must be

sorted into different piles, labeled 'direct' and 'indirect,' that are evaluated differently." *Ortiz v. Werner Enterprises*, 834 F.3d 760, 766 (7th Cir. 2016). "Instead, all evidence belongs in a single pile and must be evaluated as a whole." *Id.* "[W]hen all is said and done, the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination." *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014).

### a)  <u>Direct Method of Proof</u>

In this case, there is both "something close to an explicit admission," *Diaz*, 653 F.3d at 587, as well as other, circumstantial evidence that RAC decided to end Megan Kerr's employment because it disapproved of her transgender status and/or her gender transition.

There is direct evidence that district manager Jason Carnahan decided to fire Kerr because of her transition to female and/or because he disapproved of having a transgender employee in the store.  In March 2013, Russell Kasper, the store manager of the Rantoul store, informed Carnahan that Kerr was transitioning to female and that her name was changing to "Megan."  DSF Nos. 3-6; PSF No. 2.[5]  When Kasper told him this, Carnahan informed him he disapproved of the gender transition and of having a transgender employee in the store.  PSF No. 4.  Carnahan told Kasper to "do whatever it takes" to find a basis for discharging Kerr, by finding infractions to document in order to create a basis for a discharge.  PSF No. 5.  Carnahan emphasized that "we have to have documentation" and even added that Kasper should make sure that "it's not just little things."  DSF No. 56; PSF No. 5.

Carnahan's statements to Kasper are direct evidence, since they are "akin to an admission" that Carnahan's determination that Kerr should be fired was motivated by her gender

---

[5] Herein, citations of the form "DSF No. XX" refer to Defendant's Statements of Fact, and citations of the form "PSF No. XX" refer to Plaintiff's Additional Statements of Fact.

transition.  *See Perez*, 731 F.3d at 710; *Diaz*, 653 F.3d at 587 (direct evidence is "something close to an explicit admission" that "a particular decision was motivated by discrimination").  A jury could conclude directly from Carnahan's statements that Kerr's gender identity and/or gender transition — and, therefore, sex — motivated Carnahan's decision to discharge her.[6]

RAC has suggested that Carnahan's March 2013 statements cannot be evidence of discrimination because too much time passed between those statements and Carnahan's final approval of Kerr's discharge in July 2014 (PSF No. 17).  However, this confuses temporal proximity with causation.  While it is true that "there must be something (*such as* temporal proximity) to link [Carnahan's comments] and the adverse employment action," *Diaz*, 653 F.3d at 589 (emphasis added), temporal proximity itself is not required — because it is not the only way a statement can be linked to an adverse employment action.  *See Lalvani v. Cook County, Illinois*, 269 F.3d 785, 791 (7th Cir. 2001) ("[T]emporal proximity is only evidence of causation, not a separate element of the prima facie case, and thus there will be cases in which a plaintiff can demonstrate causation despite a substantial time lag."); *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) (to be direct evidence, comments "must be contemporaneous with the discharge *or* causally related to the discharge decision making process" (emphasis added)); *see also Adelman-Reyes v. Saint Xavier University*, 500 F.3d 662, 666-67 (7th Cir. 2007) (remarks are not direct evidence when they "are neither proximate *nor* related to the employment decision" (emphasis added)); *Kogucki v. Metro. Water Reclamation Dist. of Greater Chicago*, 698 F. Supp. 2d 1026, 1039-41 (N.D. Ill. 2010).[7]  After a thorough discussion of this point, the court in *Kogucki*  held that a decisionmaker's statement to the plaintiff that "you will never be

---

[6] "[A]n unlawful employment practice is established when the complaining party demonstrates that ... sex ... was a motivating factor for any employment practice..."  42 U.S.C. § 2000e-2(m).

[7] Likewise, in the context of retaliation, "[t]he mere passage of time is not legally conclusive proof against retaliation."  *Malin v. Hospira*, 762 F.3d 552, 559 (7th Cir. 2014).

promoted because of your complaints" was direct evidence that the employer's refusal to promote her two years later was retaliation, despite the lack of close temporal proximity.  *See id.* at 1039-42.  This was so because "the adverse action is directly linked to the statement of prohibited animus within the statement itself."  *See id.* at 1031-33, 1040-41.  Carnahan's statements, too, reflected not just disapproval of having a transgender employee in the store but also his decision to do something about it.  Because the statements themselves link Kerr's transition and transgender status to the decision that she needed to go, the statements are direct evidence.

However Carnahan's statements are characterized, they must be considered along with the considerable other, circumstantial evidence in this case.  Under the direct method of proof, circumstantial evidence generally falls into three categories:  (1) "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of [discriminatory] intent might be drawn," (2) "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently," and (3) "evidence that the employer offered a pretextual reason for an adverse employment action."  *Perez*, 731 F.3d at 711.  While a "plaintiff need not produce evidence in each category to survive summary judgment," *Diaz*, 653 F.3d at 587, all three categories are in fact present here.

There is evidence of suspicious timing and pretext.  After expressing disapproval of Kerr's gender transition in March 2013, Carnahan continued to pressure Kasper — on a roughly weekly basis — to find a pretext for firing her for the rest of 2013.  PSF No. 6; DSF No. 8.  After eight months of Kasper not playing ball, Carnahan fired Kasper and, in February 2014, replaced

him with Jason Morris. [8]  PSF Nos. 7-9.  A few months later, Morris supplied Carnahan with a

basis for discharging Kerr — with "documentation" — just as Carnahan had sought.  On

Saturday, July 19, 2014, Morris gave Kerr permission to use a RAC delivery vehicle for a

previously-scheduled delivery to a customer the next day;  indeed Morris gave Kerr the keys

himself.  PSF Nos. 11-12.[9]  The next day, Sunday, July 20, 2014, knowing full well that Kerr

was using the RAC delivery vehicle for the delivery he approved, Morris went to the store, took

a date-stamped picture to "document" the fact that the vehicle was not there, and then called

Carnahan.  PSF No. 14.  During that call, Carnahan and Morris agreed to discharge Kerr, and

Morris carried out the termination the next day.[10]  PSF Nos. 14, 17.  The next morning, Monday,

July 21, 2014, Morris fired Kerr for personal use of a RAC delivery vehicle.  PSF Nos. 17-19.

This explanation of Kerr's discharge is pretextual because on Sunday, July 20, 2014, Kerr was

not using the vehicle to move personal belongings, but rather to make a delivery to a customer

that Morris himself approved.  PSF Nos. 15-16.

There is also evidence that similarly situated employees were treated more favorably.

Although RAC and its managers maintain that violation of RAC's policy against personal use of

a RAC vehicle "automatically" results in an employee's termination, PSF Nos. 21-22, that is

untrue.  RAC learned that two nontransgender employees in the same district, Matthew Hawley

---

[8] In evaluating the totality of the evidence, a jury could take note of the fact that Kasper's discharge is itself suspicious:  In the final performance plan that Carnahan gave him, Kasper was given just three days to increase store sales by 57% to avoid discharge.  PSF No. 8.

[9] Despite RAC's protestation to the contrary, there is evidence that such use of the RAC delivery vehicles on Sundays was not unprecedented.  PSF. No. 10.

[10] Carnahan also obtained approval to fire Kerr from RAC Regional Director David Leavengood. However, in signing off on the discharge, Leavengood merely relied upon information provided by Carnahan.  PSF No. 20.  Accordingly the EEOC need not demonstrate discriminatory intent on the part of Leavengood.  *See Smith v. Chicago Transit Authority*, 806 F.3d 900, 906 (7th Cir. 2015) ("employer liable if the decision-maker was manipulated by another employee acting with discriminatory intent") (citing *Staub v. Proctor Hosp.,* 562 U.S. 411, 419, (2011)).

and Michael Moreland, had made personal use of RAC vehicles, and yet they were not discharged.  PSF Nos. 23-26.  RAC and Morris (who supervised Hawley) maintain that the reason Hawley merely got a verbal warning for this infraction was that he "did the right thing and told us about it" and "took responsibility for his actions."  PSF Nos. 23-24.  However, as RAC and Morris tell it, Kerr also freely acknowledged making personal use of the RAC vehicle when Morris talked to her about it on Monday morning, PSF No. 15, and yet Kerr was still fired.

Finally, one of the "other bits and pieces" of circumstantial evidence here is evidence that RAC attempted to influence the testimony of a witness important to the EEOC's case, Amber Shumate.  A jury may consider this as evidence of consciousness of guilt.  *See Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 534 (7th Cir. 2003) ("[A]n attempt by a litigant to persuade a witness not to testify is properly admissible against him as an indication of his own belief that his claim is weak or unfounded or false."); *U.S. v. Shorter*, 54 F.3d 1248, 1260 (7th Cir. 1995) (letter from defendant urging prosecution witness not to testify was "admissible as evidence of [defendant's] consciousness of guilt.").  Shumate is the customer who purchased the RAC merchandise that Kerr delivered on the Sunday in question, and Shumate corroborates that Kerr delivered the furniture to her on a Sunday in July 2014.  PSF No. 16.  During discovery, a private investigator working on behalf of RAC confronted Shumate at her home, acted in an "aggressive" and "domineering" manner, attempted to influence her testimony in this matter, and left her in tears.  PSF No. 27.  Although Shumate ultimately complied with a deposition subpoena, she testified that the private investigator's actions affected her willingness to participate in this suit.  *Id.*

In sum, this case involves both direct evidence and all of the types of circumstantial evidence typically considered under the direct method of proof.  Viewed in the light most

favorable to the plaintiff, as is required on summary judgment, this evidence would permit a reasonable jury to conclude that RAC discharged Kerr because of her gender transition and/or transgender status.

### b)  Indirect Method of Proof

To survive summary judgment under the indirect method of proof, a plaintiff must produce some evidence that, if credited, would establish a prima facie case of discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405-06 (7th Cir. 2007). The burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for the termination. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). "If the employer does so, the burden shifts back to the plaintiff to submit evidence demonstrating that the employer's explanation is a pretext." *Id.*

### i)  There is Evidence to Support a Prima Facie Case

"The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). To establish a prima facie case the EEOC must demonstrate that "(1) [Kerr] is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class received more favorable treatment." *Keeton*, 667 F.3d at 884.

The elements of a prima facie case are satisfied here. Kerr is transgender. PSF Nos. 1-2.[11] Prior to the disputed events of July 2014, she met RAC's legitimate expectations. PSF

---

[11] Although it is sometimes suggested that transgender people are not a "protected class," that is inconsistent with the proposition that gender identity discrimination is a form of sex discrimination. A careful look at the meaning of a "protected class" under the *McDonnell Douglas* analysis makes clear why this is so. The *McDonnell Douglas* inquiry "was never intended to be rigid, mechanized, or ritualistic." *See U.S. Postal Service Board of Governors v.*

No. 3.  She suffered an adverse action: termination.  PSF No. 17.

With respect to the fourth element, there are two similarly situated employees, Hawley and Moreland, who received more favorable treatment.  PSF Nos. 23-26.  "To satisfy [the comparator] requirement, a plaintiff must identify at least one employee who is directly comparable to her in all material respects."  *Perez v.* 731 F.3d at 704 (*citing Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)).  "The proposed comparator need not be identical in every conceivable way, however, and courts must conduct a 'common-sense examination.'"  *Coleman*, 667 F.3d at 846.  "We are looking for comparators, not 'clone[s].' … So long as the distinctions between the [employee] and the proposed comparators are not 'so significant that they render the comparison effectively useless,' the similarly-situated requirement is satisfied."  *Id.* (internal citations omitted).  Rather than being onerous, "[t]he purpose of the similarly situated requirement is to provide plaintiffs the 'boost' that the McDonnell Douglas framework intended."  *Id*. at 846-47, 851-52.

Here the EEOC has presented evidence that Hawley and Moreland, who are not transgender, each engaged in the same type of misconduct that Kerr was accused of and were not

---

*Aikens*, 460 U.S. 711, 715 (1983).  Although its typical formulation makes reference to membership in a "protected class," the Supreme Court has made clear that the *McDonnell-Douglas* inquiry is designed to identify the use of discriminatory *criteria*:  "The importance of McDonnell Douglas lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based *on a discriminatory criterion* illegal under the Act."  *Int'l Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 358 (1977) (emphasis added).  Indeed, the text of Title VII identifies prohibited criteria — race, color, sex, religion, and national origin — and does not mention any "protected classes" at all.  A group is a "protected class" because it is defined by reference to one of those prohibited criteria.  For example, women, Catholics, and Mexicans are each protected classes, not because any of those groups is expressly mentioned in Title VII — they aren't — but rather because they are classes defined by reference to the prohibited criteria of sex, religion, and national origin, respectively.  Since transgender people are a class that is defined by reference to sex-based considerations, *see* Argument § B, above, they are therefore a protected class, too.

fired.  PSF Nos. 23, 25-26.  Hawley, like Kerr, was supervised by Morris.  PSF No. 23.

Moreland worked at the same store Kerr did.  PSF No. 25.  Hawley received at most a verbal

warning, and RAC simply allowed Moreland's previously-announced resignation to take effect

rather than taking any action against him at all.  PSF Nos. 24-25.  RAC identifies distinctions

between these employees and Kerr, but given RAC's view that improper vehicle use

automatically leads to termination, there is at least a dispute of fact as to whether those

distinctions actually matter.  *See Coleman*, 667 F.3d at 849-50.  Hawley and Moreland are proper

comparators.

### ii)  There is Evidence that RAC's Asserted Reason for Firing Kerr is Pretextual

An employee may "establish that [s]he was the victim of intentional discrimination by

showing that the employer's proffered explanation is unworthy of credence."  *Reeves v.*

*Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 143 (2000).  "In appropriate circumstances, the

trier of fact can reasonably infer from the falsity of the explanation that the employer is

dissembling to cover up a discriminatory purpose."  *Id*. at 188.  The question is not whether the

employer has pointed to a valid reason for firing the employee, but whether it has pointed to an

honest one; "[i]f the stated reason ... wasn't what induced [the employer] to take the challenged

employment action, it was pretext."  *Perez*, 731 F.3d at 708.

RAC says it fired Kerr because she used a RAC truck for personal reasons.  As discussed

in the direct method section (Argument § C.1.a, above), there is ample evidence that this is a

pretext, including suspicious timing, comparator evidence, and Carnahan's own statements

reflecting his motivation in terminating Kerr.  As proposed in *Ortiz*, and for the sake of brevity,

the EEOC incorporates that previous discussion here.  *Ortiz*, 834 F.3d at 766 (direct and

circumstantial evidence must be considered together and not "evaluated differently").

13

*Perez* also forecloses RAC's temporal proximity argument as a basis for summary judgment: it is a reasonable inference that "if a person was racist or sexist at Time A (time of the remark) … [then] the person was still racist or sexist at Time B (when he made or influenced the decision to fire the plaintiff)," and it is for "the jury to hear such evidence and weigh it for what it is worth." *Perez*, 731 F.3d at 710.

## D.        Disputes of *Immaterial* Facts Are Not a Basis For Summary Judgment

RAC's motion focuses almost entirely on conflicting testimony about the details of the residential move of Amber Shumate, the customer to whom Kerr made the delivery on July 20, 2014.  It zeros in on such matters as how many people assisted Shumate with that move, whether or not they were members of the local chapter of the Free Masons, whether their assistance to Shumate was an officially-sponsored Masonic service project, and whether the RAC merchandize that Kerr moved had come out of commercial or residential storage.  These issues are wholly immaterial because the jury does not have to determine any of them in order to decide whether Carnahan's disapproval of Kerr's gender transition motivated her discharge.

Moreover, it is elementary that *disputed* facts are not a basis for summary judgment, whether material or immaterial.  RAC's motion relies heavily on a very narrow exception to that principle found in *Seshadri v. Kasraian*, 130 F.3d 798 (7th Cir. 1997).  *Seshadri* stands for the proposition that when a party offers his own, wholly irreconcilable statements about a *material* issue on which the party has presented no other evidence, summary judgment may be warranted. The case involved a copyright infringement claim in which the plaintiff's only evidence that he was indeed the sole author of the work at issue was an affidavit he signed, which contradicted, without explanation, a host of written documents in which he had earlier given a graduate student joint authorship credit.  *Id*. at 801-04.  Needless to say, whether a plaintiff is the author of the

14

work in question is plainly a material issue in a copyright suit.[12]

Judge Posner — who wrote the opinion in *Seshadri* — emphasized one year later how exceptional that case was:

> [C]redibility issues are to be left to the trier of fact to resolve on the basis of oral testimony except in extreme cases.  The exceptional category is— exceptional.  For the case to be classified as extreme, the testimony sought to be withheld from the trier of fact must be not just implausible, but utterly implausible in light of all relevant circumstances.

*In re Chavin*, 150 F.3d 726, 728-29 (7th Cir. 1998).

*Seshadri* has no application here, because the allegedly irreconcilable statements RAC identifies are offered by *different* witnesses about *immaterial* facts, and because the EEOC has, in any event, offered extensive direct and circumstantial evidence to support the material elements of its claim.  Kerr's statements have never contradicted the EEOC's contentions on the material issue of pretext, for example: that Kerr's manager gave her permission to use the RAC truck on Sunday and yet she was fired on Monday for using it as authorized.  There is nothing "utterly implausible" or irreconcilable about Kerr's testimony on this material point.

To be sure, there is conflicting testimonial evidence — from different witnesses — about details such as whether the furniture moved on July 20, 2014, was initially in commercial or residential storage, and how many members of a Masonic lodge were assisting Shumate in moving her other belongings that day.  And a jury may well consider some of those conflicting accounts in evaluating which witnesses are more credible or have better memories.  But these ancillary issues themselves are not material to the EEOC's claim.

Moreover, even if RAC could show that there were irreconcilable conflicts in Kerr's

---

[12] Similarly, the other case principally relied upon by RAC, *Melton v. Tippecanoe County*, was FLSA overtime case in which the plaintiff had no evidence to show that he had worked during his lunch breaks, other than his own conflicting and irreconcilable statements on that topic.  *See* 838 F.3d 814 (7th Cir. 2016).  Hours worked is obviously a material issue in an overtime claim.

testimony of the sort described in *Seshadri*, summary judgment would still be unwarranted because even if Kerr's testimony were simply set aside altogether, there is still other evidence in the record that is sufficient to support the EEOC's claim and defeat summary judgment.  For example, it is Kasper who provides testimony about Carnahan's disapproval of Kerr's gender transition, Carnahan's instruction to find a pretext for firing her, and Carnahan's continuing inquiries throughout 2013 about the status of that effort.  PSF Nos. 4-5.  And evidence about comparators Hawley and Moreland comes from various other witnesses and RAC interrogatory responses, not Kerr.  PSF Nos. 21-26.

The material issues of fact in this case are disputed must be resolved by a jury, at trial.

### E.     RAC's Attorney Fee Request Is Premature and Without Merit

RAC's request for attorney fees is premature, as judgment has not been entered and thus there is no prevailing party.  *See* CDIL-LR 54.1(A) ("In all civil cases, requests for attorneys fees must be filed no later than 14 days *after* entry of judgment." (emphasis added)).

Moreover, under Title VII, an award of attorney fees is only available to a prevailing defendant in the limited circumstance in which a Title VII action is "frivolous, unreasonable or without foundation."  *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978).  Although a "plaintiff's failure … to survive a motion for summary judgment … does not alone render the action frivolous justifying an award of fees to the defendant," *Coates v. Bechtel*, 811 F.2d 1045, 1050 (7th Cir. 1987), a claim that *does* withstand a summary judgment motion is plainly not frivolous, *see LeBeau v. Libbey-Owens-Ford Co.*, 799 F.2d 1152, 1159 (7th Cir. 1986) ("when a trial judge rules that there are facts under which a plaintiff can prevail, it is highly inconsistent for him to later find the suit frivolous because it is foreclosed as a matter of law.").

RAC itself represented to the court on April 24, 2017, that "there are enough fact issues in the case [that] it doesn't make sense to file a motion for summary judgment." PSF No. 28. A case in which even the defendant acknowledges summary judgment is beyond reach is not a frivolous case.

## CONCLUSION

Construed in the light most favorable to the EEOC, the evidence shows that a RAC district manager disapproved of Megan Kerr's gender transition and asked a store manager to find a pretext to fire her, and that eventually this is precisely what happened. RAC's explanation of Kerr's discharge is a pretext. Because there are disputes of material fact that require a trial, the EEOC respectfully requests that summary judgment be denied.

July 5, 2017                                  Respectfully Submitted,

                                             s/ Justin Mulaire
                                             U.S. Equal Employment
                                               Opportunity Commission
                                             33 Whitehall St., Fl. 5
                                             New York, NY  10004
                                             212-336-3744

                                             s/ Miles Shultz
                                             U.S. Equal Employment
                                               Opportunity Commission
                                             500 West Madison St., Ste. 2000
                                             Chicago, IL 60661
                                             312-869-8053

## CERTIFICATE OF SERVICE

I hereby certify that on today's date, I caused the PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT to be served upon counsel to Defendant via the court's Electronic Case Filing system, pursuant to Local Rule 5.3(A).

July 5, 2017                                        Respectfully Submitted,


                                                   s/ Justin Mulaire
                                                   U.S. Equal Employment
                                                     Opportunity Commission
                                                   33 Whitehall St., Fl. 5
                                                   New York, NY  10004
                                                   212-336-3744


## CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION

I hereby certify that the Argument section of the foregoing memorandum complies with type volume limitation set forth in Local Rule 7.1(B)(4)(b).  According to Microsoft Word, the total word count of the Argument section (including the Conclusion), including main text and footnotes, is 5,683, and the total number of characters (including spaces) is 35,816.

July 5, 2017                                        Respectfully Submitted,


                                                   s/ Justin Mulaire
                                                   U.S. Equal Employment
                                                     Opportunity Commission
                                                   33 Whitehall St., Fl. 5
                                                   New York, NY  10004
                                                   212-336-3744