```
              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF ILLINOIS

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
                                    Docket No. 16-2222
         Plaintiff,

   vs.                              Urbana, Illinois
                                    May 14, 2018
                                    1:11 p.m.
RENT-A-CENTER EAST, INC.,

         Defendant.


              OPENING STATEMENT by PLAINTIFF EEOC

           BEFORE THE HONORABLE ERIC I. LONG
              UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

For the Plaintiff:       JUSTIN MULAIRE, ESQUIRE
                         EEOC
                         33 Whitehall Street, 5th Floor
                         New York, NY 10004
                         212-336-3744

                         MILES EZEKIEL SHULTZ, ESQUIRE
                         EEOC
                         500 West Madison St., Suite 2000
                         Chicago, IL 60661
                         312-869-8053

For the Defendant:       STEPHANIE J. QUINCY, ESQUIRE
                         Quarles & Brady, LLP
                         Renaissance One
                         2 North Central Avenue
                         Phoenix, AZ 85004-2391
                         602-229-5407

                         ANDREW MONROE TRUSEVICH, ESQUIRE
                         Rent-A-Center, Inc.
                         5501 Headquarters Drive
                         Plano, TX 75024
                         972-801-1465

Proceedings recorded by mechanical stenography; transcript
produced by computer.
```

1           (In open court; jury present; 1:11 p.m.)

2           MR. SHULTZ: Good afternoon.

3           We're all here today because Rent-A-Center
4 broke the law. They violated the rule that everyone
5 should be treated fairly in the workplace, even if
6 they're different.

7           Now, at the end of the next few days, you're
8 going to essentially be asked to answer one simple
9 question: Is it okay for managers to make up a plan to
10 fire an employee just because they're different, because
11 they're transgender?

12           Now, as you've heard this morning, this case
13 revolves around Rent-A-Center's termination of Megan
14 Kerr, which happened in July of 2014. Now, Megan Kerr is
15 a different kind of woman. She's transgender.

16           After being honorably discharged from the
17 military in 2001, Ms. Kerr eventually begins working for
18 Rent-A-Center in 2005, down in Texas. In 2010, she moves
19 from Texas to Illinois; and Rent-A-Center transfers her
20 to the Rantoul, Illinois, store.

21           Now, prior to 2013, Megan was known as "Jason,"
22 and she presented as a man. In 2013, she transitioned
23 from "Jason" to "Megan," from male to female. And at
24 this time -- this transition was in March of 2013. And
25 you can see that her store manager at the time was

1   Russell Kasper.  And the district manager, Kasper's boss,
2   was a man by the name of Jason Carnahan.
3           Kasper will testify and tell you that when he
4   told Jason Carnahan about Ms. Kerr's transition from
5   Jason to Megan that Carnahan had an extremely negative
6   reaction.  In fact, he said he didn't want someone like
7   that working at the Rantoul store.  And he asked Kasper
8   to document reasons to fire Megan; and not because of job
9   performance, not because of attendance -- nothing to do
10  with her job, but simply because she's different.
11          Now, in December of 2013, Russell Kasper gets
12  fired.  Jason Carnahan fires Russell Kasper.
13  Rent-A-Center says that Kasper's termination was about
14  sales at the store.  And Mr. Kasper won't dispute that
15  the sales numbers at the store that they presented him
16  with, he wasn't meeting the, the various documents they
17  were placing in front of him.  But Mr. Kasper will also
18  tell you that he thinks a part of the reason of his
19  termination was because he refused to document reasons to
20  fire Ms. Kerr as Mr. Carnahan was asking him to do.
21          So, in February of 2014, Jason Morris gets
22  hired as the store manager in Rantoul; and he documents a
23  reason to fire Ms. Kerr, something that Mr. Kasper had
24  refused to do.
25          Now, Ms. Kerr's termination from Rent-A-Center

1  happened on a Monday, July 21st of 2014.  And the
2  majority of the things you're going to hear in this case
3  over the next few days is going to resolve around --
4  revolve around Saturday, Sunday, and Monday, the 19th,
5  20th, and 21st of July 2014.
6           Rent-A-Center, they lease and they sell various
7  furniture or electronic items; and when you buy or lease
8  one of these items, they'll deliver them to you.  And
9  they have a book -- a big 3-- 2- to 3-page notebook --
10 where they write in the delivery schedule.  Ms. Kerr sees
11 that a delivery is noted in the book regarding some
12 furniture that Amber Shumate had purchased and that this
13 delivery was to happen on Sunday, July 20th.
14          Now, Ms. Shumate had purchased two sets of
15 furniture from Rent-A-Center back in February of 2014, a
16 living room set and a bedroom set.  And at the time in
17 February of 2014, Ms. Shumate was living with her
18 mother-in-law's house -- was living in her
19 mother-in-law's house, and Rent-A-Center delivered the
20 furniture to Ms. Shumate's where she was living at her
21 mother-in-law's house.  Now, eventually, she found her
22 own place to live, and various people were asked to help
23 move in July of 2014.
24          So Ms. Kerr sees on the daily activity
25 planner -- that's what they call this book where they

1  note all these deliveries -- sees it, you know, this
2  Shumate redelivery of furniture on July 20th, a Sunday.
3  So Saturday before, she asks Jason Morris's permission
4  for the store key -- for the van keys.
5         Rent-A-Center is typically closed on -- they
6  are closed on Sundays.  And while Sunday deliveries
7  aren't a weekly occurrence, they aren't unheard of
8  either.  In fact, Mr. Kasper will tell you:  When he was
9  store manager, he remembers doing a couple of Sunday --
10 using the truck a couple of times on Sunday.  For
11 instance, the Rantoul, they have an air show at the base,
12 and that closes on a Sunday.  So he remembers he went to
13 go pick up some freezers that they had leased for the
14 weekend to some vendor, and he went and retrieved those
15 on a Sunday.  He also remembers the high tech tractor
16 show; he'd done this on a Sunday.  So Sunday deliveries
17 aren't a weekly occurrence, but they aren't unheard of.
18         So Saturday night, Ms. Kerr asks Mr. Morris's
19 permission for the Rent-A-Center truck keys, and they
20 discuss that it's about this, the redelivery of furniture
21 for Ms. Shumate; and he gives her permission and hands
22 her the keys.
23         Sunday morning, Ms. Kerr wakes up, puts on a
24 red Rent-A-Center polo with a Rent-A-Center emblem on it.
25 She drives to the Rantoul store, gets the truck, goes to

1  pick up the two pieces of furniture that Ms. Shumate had
2  bought in February -- and only those two pieces of
3  furniture -- and she goes to Ms. Shumate's new place of
4  residence.
5          She gets there, and she has to wait a little
6  bit because there's other cars unloading some of Ms.
7  Shumate's other personal belongings.  She brings the two
8  pieces of furniture to the lift gate, lowers the lift
9  gate down; and then some people come, and they take the
10 furniture and move it into the house.  She returns to the
11 truck.  It's Sunday; goes home as normal.
12         Monday morning, she wakes up.  She comes to
13 work at Rantoul, at the Rent-A-Center store; and when she
14 walks in, Jason Morris summons her to his office, and he
15 terminates her for using the truck on Sunday, something
16 he had given her permission to do Saturday night.
17         Now, Jason Morris said he first learned of this
18 truck usage when he was driving by the Rantoul store on
19 Sunday morning, a day that is typically his day off.  The
20 store is closed.  At this time, in July of 2014, Mr.
21 Morris lived in Champaign, about a 25-minute drive from
22 the Rantoul store.  He says that he drove by the Rantoul
23 store on Sunday morning, a 25-minute drive from his
24 house, because he was suspicious that Ms. Kerr might be
25 using the truck.  He based those suspicions, he claims,

1  because on Saturday, the day before, Ms. Kerr, according
2  to him, had been asking to do one-person deliveries,
3  something that Rent-A-Center employees are capable of
4  and, indeed, do do.
5         Well, then he says he was suspicious on
6  Saturday because he knew that Ms. Kerr had been evicted
7  from her apartment.  But Frank Piekarski, her landlord at
8  the time, he's going to come and tell you that Ms. Kerr
9  was never evicted.
10         Then Mr. Morris says, "Oh, and I was also
11 suspicious because I knew something was happening at Ms.
12 Kerr's tattoo shop."
13         Now, during this time, Ms. Kerr had a tattoo
14 shop in Rantoul.  And while it's true she had a year-long
15 lease and she did not stay in that facility for the
16 entire year, she was never evicted from the tattoo shop.
17 And, in fact, next to the tattoo shop, there's an
18 accountant's office.  And the secretary from that
19 accountant's office is going to come and tell you that
20 she saw Ms. Kerr move out the stuff that was in the
21 tattoo shop using a personal truck and a trailer; and
22 that this was sometime in the summer of 2014, maybe in
23 July, but that it was for sure on a weekday, and not a
24 Sunday, because the accountant's office is only open on
25 the weekdays and the secretary is only there during work

1  days.

2  So whatever the alleged reason for Morris's
3  suspicions to be driving 25 minutes away from his house
4  on his day off, driving past the Rantoul parking lot,
5  he'll tell you that he could have checked Saturday night
6  to see if the keys were where they should have been, but
7  he didn't.  He could have asked Ms. Kerr what was going
8  on, but he didn't.

9  So Sunday morning, he's driving by the store,
10  and he sees Ms. Kerr's car in the parking lot and the
11  Rent-A-Center cube truck gone.  He calls his boss, Jason
12  Carnahan, and, you know, claims that he said, "I was
13  driving by the store.  Ms. Kerr's car is there, and the
14  truck's gone."

15  He claims that Jason Carnahan says, "Give me a
16  second.  I'll have to call you back."

17  Jason Morris, who was in the Rent-A-Center
18  parking lot at the time, then drives across the street --
19  well, it's the same side of the street; it's across the
20  side street -- to the AutoZone parking lot.  And while
21  he's at the AutoZone parking lot, allegedly waiting for
22  Jason Carnahan to call him back, he takes a picture of
23  Ms. Kerr's car in the parking lot and the cube truck
24  gone.  He puts a date stamp on it.  He documents the
25  reason that they needed to terminate Ms. Kerr.

1          Jason Carnahan calls him back and claims that
2    he says, "All right, go find the truck and terminate Ms.
3    Kerr."
4          Prior to going out and supposedly conducting
5    this search, Jason Morris picks up another store
6    employee, Brock Duncan-Fox.  He and Brock -- he and
7    Mr. Duncan-Fox actually had been at the county fair the
8    night before on Saturday night.  And you'll learn that
9    eventually Mr. Duncan-Fox rents a room from Mr. Morris.
10   They weren't living together at the time, but eventually
11   Mr. Duncan-Fox moves into Mr. Morris's house.
12         So he picks up Mr. Duncan-Fox, and they claim
13   they drove around Rantoul.  They went by Megan's tattoo
14   shop; she wasn't there.  They even claim they drove to
15   Paxton because they knew that's where Megan lived at the
16   time.  They couldn't find her in Paxton.  So they claim
17   they came back to the store.  Brock -- or Jason Morris
18   then drops Mr. Duncan-Fox back off where he lived in
19   Rantoul.
20         Then Monday morning, Jason Morris gets to the
21   office first, hears Ms. Kerr come in, and summons her in
22   and terminates her for using the truck on Sunday.
23         Now, Rent-A-Center is going to try and distract
24   you a lot over the next few days.  They're going to try
25   and show that Ms. Kerr is a liar who made some -- made

1  this story up.  They're going to point to areas of her
2  life that think -- that they think show her to be
3  dishonest.  They're going to highlight areas where Ms.
4  Kerr and Ms. Shumate, the woman who bought the furniture
5  in February 2014, where the memories don't quite line up.
6  For instance, Ms. Shumate remembers that Ms. Kerr picked
7  up the two pieces of furniture from the mother-in-law's
8  house, while Ms. Kerr remembers that she picked it up
9  from a commercial storage facility somewhere in Rantoul.
10         They're going to talk to you about all these
11 things, but this case is about Rent-A-Center's
12 discriminatory motive in firing Ms. Kerr.
13         Now, despite all these distractions, Ms. Kerr
14 will tell you that, as a Rent-A-Center employee for
15 almost a decade, she understood the rules regarding using
16 the truck and that she wouldn't have risked her job to
17 help Ms. Shumate move.
18         Now, as you heard earlier, my colleague, Justin
19 Mulaire, and I, we represent the Equal Employment
20 Opportunity Commission.  The EEOC is the federal agency
21 charged with enforcing the nation's employment
22 anti-discrimination laws.  And the EEOC is suing
23 Rent-A-Center because it made up this story to terminate
24 Ms. Kerr, just because she's different, just because
25 she's transgender.  Now, rather than letting Megan

1  continue to do her job for the past nine years that she
2  had, Jason Morris and Jason Carnahan found a reason to
3  get rid of her.  They could have let Ms. Kerr continue to
4  do her job at Rent-A-Center, but they chose not to.
5          Now, Ms. Kerr is depending on you to be open
6  and fair-minded and to take your job seriously this week.
7  And after both sides presents you with the evidence,
8  we'll have another turn to come up here and address you
9  directly.
10          But to finish, I'd like to leave you with a few
11  last thoughts.  First, it's wrong to treat someone
12  different just because -- it's wrong to treat someone
13  unfairly just because they're different, whether it be
14  someone learns about their religion, their age, or even
15  their gender identity.  Second, Megan knows and has
16  experienced that the vast majority of people are good and
17  fair; but she also knows that there are a few folks out
18  there who just don't want to follow the rules, who don't
19  want to be nice or fair to people who are different.
20          Well, Ms. Kerr and the EEOC is counting on you
21  not to look the other way; that you will right the wrong
22  that Rent-A-Center did in firing her just because she's
23  different.
24              (Plaintiff EEOC's opening statement
25               concludes, 1:27 p.m.)

1
2
3
4
5                    REPORTER'S CERTIFICATE
6         I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify
7    that the foregoing is a correct transcript from the
8    record of proceedings in the above-entitled matter.
9         Dated this 14th day of May, 2018.
10
11
12              _____s/Lisa Knight Cosimini_____
                   Lisa Knight Cosimini, RMR-CRR
13                 Illinois License # 084-002998
14
15
16
17
18
19
20
21
22
23
24
25