E-FILED
Monday, 11 June, 2018  12:34:44 PM
Clerk, U.S. District Court, ILCD

1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                      CENTRAL DISTRICT OF ILLINOIS
 2                          URBANA DIVISION

 3    U.S. EQUAL EMPLOYMENT            )
      OPPORTUNITY COMMISSION,          )
 4                                     )
            Plaintiff,                 )
 5                                     )
                 -vs-                  )  Case No. 2:16-cv-02222
 6                                     )
      RENT-A-CENTER EAST, INC.,        )
 7                                     )
            Defendant.                 )
 8

 9

10

11                  COURT PROCEEDINGS BEFORE

12              MAGISTRATE JUDGE ERIC I. LONG

13                       MAY 18, 2018

14                        9:00 a.m.

15

16

17

18

19

20

21

22       Janet E. Frederick, CSR, License No. 084-003526
            Area Wide Reporting & Video Conferencing
23                  301 West White Street
                 Champaign, Illinois  61820
24                      (800)747-6789

25
```

2

```
1                        I N D E X

2

3           APPEARANCES:

4               Mr. Justin Mulaire
                EEOC
5               5th Floor
                33 Whitehall Street
6               New York, New York  10004
                212.336.3744
7               justin.mulaire@eeoc.gov
                Appearing on behalf of the Plaintiff
8
                Mr. Andrew Monroe Trusevich
9               RENT-A-CENTER, INC.
                5501 Headquarters Drive
10              Plano, Texas  75024
                972.801.1465
11              andy.trusevich@rentacenter.com
                Appearing on behalf of the Defendant
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              THE COURT:  Good morning, everybody.

2    Anything we need to take up, or are you ready to get

3    to work?

4              MR. MULAIRE:  Plaintiff is ready.

5              MR. TRUSEVICH:  Defense is ready.

6              THE COURT:  All right.  Let's get to

7    work, then.

8              (The following was held in the presence of

9              the Jury.)

10             THE COURT:  Good morning, ladies and

11   gentlemen.  Thank you for being on time.  We're

12   almost on time ourselves, which is a pleasant change.

13   I'm going to -- you've seen and heard all the

14   evidence, and you're going to hear the arguments of

15   the attorneys.  Now I'm going to instruct you on the

16   law.

17             You have two duties as a jury.  We're going

18   to go ahead.  Ladies and gentlemen, we're grabbing a

19   copy of the instructions for each of you to follow

20   along.  So what I will do is read the instructions to

21   you, and you can follow along.  Tom just ran to grab

22   those for you.  He'll hand those out.

23             You have two duties as a jury.  Your first

24   duty is to decide the facts from the evidence in the

25   case.  This is your job, and yours alone.

4

1          Your second duty is to apply the law that I

2     give you to the facts.  You must follow these

3     instructions, even if you disagree with them.  Each

4     of the instructions is important, and you must follow

5     all of them.

6          Perform these duties fairly and

7     impartially.  Do not allow prejudice to influence

8     you.

9          Nothing I say now, and nothing I said or

10    did during the trial, is meant to indicate any

11    opinion on my part about what the facts are or about

12    what your verdict should be.

13          The evidence consists of the testimony of

14    the witnesses, the exhibits admitted in evidence, and

15    stipulations.

16          A stipulation is an agreement between both

17    sides that certain facts are true or that a person

18    would have given certain testimony.

19          In determining whether any fact has been

20    proved, you should consider all of the evidence

21    bearing on the question regardless of who introduced

22    it.

23          You may have heard the phrases "direct

24    evidence" and "circumstantial evidence."  Direct

25    evidence is proof that does not require an inference,

1    such as the testimony of someone who claims to have

2    personal knowledge of a fact.  Circumstantial

3    evidence is proof of a fact, or a series of facts,

4    that tends to show that some other fact is true.

5            As an example, direct evidence that it is

6    raining is testimony from a witness who says, "I was

7    outside a minute ago and I saw it raining."

8    Circumstantial evidence that it is raining is the

9    observation of someone entering a room carrying a wet

10   umbrella.

11           The law makes no distinction between the

12   weight to be given to either direct or circumstantial

13   evidence.  You should decide how much weight to give

14   to any evidence.  In reaching your verdict, you

15   should consider all the evidence in the case,

16   including the circumstantial evidence.

17           You should use common sense in weighing the

18   evidence and consider the evidence in light of your

19   own observations in life.

20           In our lives, we often look at one fact and

21   conclude from it that another fact exists.  In law we

22   call this "inference."  A jury is allowed to make

23   reasonable inferences.  Any inference you make must

24   be reasonable and must be based on the evidence in

25   the case.

1            You must decide whether the testimony of

2    each of the witnesses is truthful and accurate, in

3    part, in whole, or not at all.  You also must decide

4    what weight, if any, you give to the testimony of

5    each witness.

6            In evaluating the testimony of any witness,

7    including any party to the case, you may consider,

8    among other things:  The ability and opportunity the

9    witness had to see, hear, or know the things that the

10   witness testified about; the witness' memory; any

11   interest, bias, or prejudice the witness may have;

12   the witness' intelligence; the manner of the witness

13   while testifying; and the reasonableness of the

14   witness' testimony in light of all the evidence in

15   the case.

16           If you decide that, before or during the

17   trial, one of the witnesses made a statement not

18   under oath that is inconsistent with his or her

19   testimony here in court, you may consider the earlier

20   statement only in deciding whether his or her

21   testimony here in court was true and what weight to

22   give to the testimony here in court.

23           In considering a prior inconsistent

24   statement, you should consider whether it was simply

25   an innocent error or an intentional falsehood and

7

1    whether it concerns an important fact or an

2    unimportant detail.

3           During the trial, certain testimony was

4    presented to you by the reading of depositions and

5    video.  You should give this testimony the same

6    consideration you would give it had the witnesses

7    appeared and testified here in court.

8           You will recall that during the course of

9    this trial I instructed you that I admitted certain

10   documents for a limited purpose.

11          You must consider this evidence only for

12   the limited purpose for which it was admitted.

13          Certain things are not to be considered as

14   evidence.  I will list them for you.

15          First, if I told you to disregard any

16   testimony or exhibits or struck any testimony or

17   exhibits from the record, such testimony or exhibits

18   are not evidence and must not be considered.

19          Second, anything that you may have seen or

20   heard outside the courtroom is not evidence and must

21   be entirely disregarded.  This includes any press,

22   radio, Internet or television reports you may have

23   seen or heard.  Such reports are not evidence and

24   your verdict must not be influenced in any way by

25   such publicity.

8

1          Third, questions and objections or comments

2     by the lawyers are not evidence.  Lawyers have a duty

3     to object when they believe a question is improper.

4     You should not be influenced by any objection, and

5     you should not infer from my rulings that I have any

6     view as to how you should decide the case.

7          Fourth, the lawyers' opening statements and

8     closing arguments to you are not evidence.  Their

9     purpose is to discuss the issues and the evidence.

10    If the evidence as you remember it differs from what

11    the lawyers said, your memory is what counts.

12         Any notes you have taken during this trial

13    are only aids to your memory.  The notes are not

14    evidence.  If you have not taken notes, you should

15    rely on your independent recollection of the evidence

16    and not be unduly influenced by the notes of other

17    jurors.  Notes are not entitled to any greater weight

18    than the recollections or impressions of each juror

19    about the testimony.

20         You may find the testimony of one witness

21    or a few witnesses more persuasive than the testimony

22    of a larger number.  You need not accept the

23    testimony of the larger number of witnesses.

24         The law does not require any party to call

25    as a witness every person who might have knowledge of

9

1    the facts related to this trial.  Similarly, the law

2    does not require any party to present as exhibits all

3    papers and things mentioned during the trial.

4         Certain demonstrative exhibits were shown

5    to you.  Those exhibits are used for convenience and

6    to help explain the facts of the case.  They are not

7    themselves evidence or proof of any facts.

8         In this case, Rent-A-Center is a

9    corporation, and the Equal Employment Opportunity

10   Commission is a governmental entity.  All parties are

11   equal before the law.  A corporation and governmental

12   entity are entitled to the same fair consideration

13   that you would give any individual person.

14        When I say a particular party must prove

15   something by "a preponderance of the evidence" or

16   when I use the expression "if you find," or "if you

17   decide," this is what I mean:  When you have

18   considered all the evidence in the case, you must be

19   persuaded that it is more probably true than not

20   true.

21        The EEOC claims that Ms. Kerr was

22   terminated by Defendant because of her transgender

23   status.  To succeed on this claim, the EEOC must

24   prove by a preponderance of the evidence that Ms.

25   Kerr's transgender status was a motivating factor for

1    the decision to terminate her employment.  That is,

2    the EEOC must prove that Ms. Kerr's transgender

3    status contributed to Rent-A-Center's decision to

4    terminate her employment, even if other factors also

5    contributed to the termination.

6           If you find that the EEOC has proved that

7    Ms. Kerr's transgender status contributed to

8    Rent-A-Center's decision to terminate her, you must

9    then decide whether Rent-A-Center proved by a

10   preponderance of the evidence that it would have

11   terminated her even if Ms. Kerr was not transgender.

12   If so, you must enter a verdict in favor of the EEOC

13   but you may not award the EEOC damages.

14          If you find that the EEOC has proved its

15   claim against Rent-A-Center, then you must determine

16   what amount of damages, if any, the EEOC is entitled

17   to recover.  The EEOC must prove its damages by a

18   preponderance of the evidence.

19          If you find that the EEOC has failed to

20   prove its claim, then you will not consider the

21   question of damages.

22          You may award compensatory damages only for

23   injuries that the EEOC has proved by a preponderance

24   of the evidence were caused by Rent-A-Center's

25   wrongful conduct.

1          Your award must be based on evidence and

2     not speculation or guesswork.  This does not mean,

3     however, that compensatory damages are restricted to

4     the actual loss of money; they include both the

5     physical and mental aspects of injury, even if they

6     are not easy to measure.

7          In calculating damages, you should not

8     consider the issue of lost wages and benefits.  The

9     court will calculate and determine damages for past

10    or future lost wages and benefits, if appropriate.

11         You should only consider the following

12    types of compensatory damages, and no others:  The

13    physical and mental or emotional pain and suffering

14    that Ms. Kerr has experienced.  No evidence of the

15    dollar value of physical or mental/emotional pain and

16    suffering has been or needs to be introduced.  There

17    is no exact standard for setting the damages to be

18    awarded on account of pain and suffering.  You are to

19    determine an amount that will fairly compensate Ms.

20    Kerr for the injury she has sustained.

21         If you find for the EEOC, you may, but are

22    not required to, assess punitive damages against

23    Rent-A-Center.  The purposes of punitive damages are

24    to punish a defendant for his conduct and to serve as

25    an example or warning to Rent-A-Center and others not

1    to engage in similar conduct in the future.

2            The EEOC must prove by a preponderance of

3    the evidence that punitive damages should be assessed

4    against Rent-A-Center.  You may assess punitive

5    damages only if you find the conduct of

6    Rent-A-Center's managers was in reckless disregard of

7    Ms. Kerr's rights.  An action is in reckless

8    disregard of Ms. Kerr's rights if taken with

9    knowledge that it may violate the law.

10           The EEOC must prove by a preponderance of

11   the evidence that Rent-A-Center's managerial

12   employees acted within the scope of their employment

13   and in reckless disregard of Ms. Kerr's right not to

14   be discriminated against.  You should not, however,

15   award the EEOC punitive damages if Rent-A-Center

16   proves that it made a good faith effort to implement

17   an anti-discrimination policy.

18           If you find that punitive damages are

19   appropriate, then you must use sound reason in

20   setting the amount of those damages.  Punitive

21   damages, if any, should be in an amount sufficient to

22   fulfill the purposes that I have described to you,

23   but should not reflect bias, prejudice, or sympathy

24   toward either or any party.

25           In determining the amount of any punitive

1    damages, you should consider the following factors:

2    The reprehensibility of Rent-A-Center's conduct; the

3    impact of Rent-A-Center's conduct on Ms. Kerr; the

4    relationship between Ms. Kerr and Rent-A-Center; the

5    likelihood that Rent-A-Center would repeat the

6    conduct if an award of punitive damages is not made;

7    the relationship of any award of punitive damages to

8    the amount of actual harm Ms. Kerr suffered.

9              Upon retiring to the jury room, you must

10   select a presiding juror.  The presiding juror will

11   preside over your deliberations and will be your

12   representative here in court.

13             Forms of verdict have been prepared for

14   you.  These forms, ladies and gentlemen, are the last

15   two pages of your packet.  If you'll turn there, I

16   will read them and we'll go over them together.

17             The first question is:  "Was Megan Kerr's

18   transgender status a motivating factor in

19   Rent-A-Center's decision to discharge her?"  You then

20   place your answer yes or no in the line.

21             If your answer to Question No. 1 is "Yes,"

22   then answer Question No. 2.  In other words, you move

23   on to Question No. 2.  If you answered "No" to

24   Question No. 1, then proceed to the end of this form

25   and sign and return this verdict form.

1          Question No. 2:  "Would Rent-A-Center have

2     made the same decision to discharge Megan Kerr even

3     if it had not considered her transgender status?"  If

4     your answer to Question No. 2 is "No," then proceed

5     to Question No. 3.  If you answered "Yes" to Question

6     No. 2, then proceed to the end of this form and sign

7     and return this verdict form.

8          Question No. 3:  "What amount will fairly

9     compensate Megan Kerr for the physical, emotional,

10    and/or mental pain she experienced, if any, as a

11    result of Rent-A-Center's decision to discharge her?"

12    You place your answer on the line and proceed to

13    Question No. 4:  "Are punitive damages appropriate?"

14    You place your answer on the line.

15          If you answered "Yes" to Question No. 4,

16    then answer Question No. 5.  If you answered "No" to

17    Question No. 4, then proceed to the end of this form

18    and sign and return this verdict form.

19          Question No. 5:  "What amount will be

20    sufficient to punish Rent-A-Center for its conduct

21    and to serve as an example or warning to

22    Rent-A-Center and others not to engage in similar

23    conduct in the future?"  You place your answer to

24    that question on the line.

25          Once you've completed the form as explained

1    to you, then each of you should sign the form as

2    designated.

3            If you'll turn back to the page that we

4    left from.  You will take the jury instructions and

5    the verdict forms with you to the jury room.  When

6    you have reached a unanimous agreement on each

7    verdict, your presiding juror will fill it in and

8    date the appropriate form and all of you will sign

9    it.

10           Now, I do not anticipate that you will need

11   to communicate with me.  If you do need to

12   communicate with me, the only proper way is in

13   writing.  The writing must be signed by the presiding

14   juror, or, if he or she is unwilling to do so, by

15   some other juror.  The writing should be given to the

16   marshal, who will give it to me.  I will respond

17   either in writing or by having you return to the

18   courtroom so that I can respond orally.

19           If you do communicate with me, you should

20   not indicate in your note what your numerical

21   division is, if any.

22           The verdict must represent the considered

23   judgment of each juror.  Your verdict, whether for or

24   against the parties, must be unanimous.

25           You should make every reasonable effort to

1    reach a verdict.  In doing so, you should consult

2    with one another, express your own views, and listen

3    to the opinions of your fellow jurors.  Discuss your

4    differences with an open mind.  Do not hesitate to

5    reexamine your own views and change your opinion if

6    you come to believe it is wrong.  But you should not

7    surrender your honest beliefs about the weight or

8    effect of evidence solely because of the opinions of

9    other jurors or for the purpose of returning a

10   unanimous verdict.

11           All of you should give fair and equal

12   consideration to all the evidence and deliberate with

13   the goal of reaching an agreement that is consistent

14   with the individual judgment of each juror.  You are

15   impartial judges of the facts.

16           That concludes my instructions.  We're

17   going to proceed next to closing arguments and,

18   Mr. Mulaire or Mr. Shultz, are you prepared?

19                   MR. MULAIRE:  Yes, your Honor.

20                   THE COURT:  You may proceed.

21                   MR. MULAIRE:  Good morning.  Ladies

22   and gentlemen of the jury, may it please the Court.

23   First of all, on behalf of the EEOC and my

24   colleagues, Miles Shultz and Kimberly Braden, I want

25   to thank you for your time and attention here this

1    week and for what really is the importance of your

2    duty here.

3           There's one claim in this case, and it's

4    that Rent-A-Center violated the law when it fired

5    Megan Kerr.  The law that Rent-A-Center broke is an

6    important one.  It's the law that protects

7    everybody's right to earn a living without being

8    discriminated against for who you are, whether that's

9    on the basis of age, gender, race, national origin,

10   disability, or any other illegal consideration,

11   including transgender status.

12          In this country, we want people to be able

13   to have a fair opportunity to earn a living and be

14   contributing members of society, and that's what that

15   law is here to protect.

16          My colleague, Mr. Shultz, told you at the

17   beginning of this case there would be a lot of

18   efforts to distract you this week.  I think he was

19   right.  In a little while you're going to get the

20   verdict form that you just heard read to you and you

21   just looked over yourselves, and, as you just saw,

22   the questions that you are going to be asked are the

23   ones that are on that form.

24          You also see that there are a number of

25   questions you are not going to be asked on that

1    verdict form.  You'll see that there is no question

2    on the verdict form about harassment.  You'll also

3    see that there's no question on that verdict form

4    about demotion.

5            We've heard an awful lot this week about

6    harassment, demotion.  We've heard a lot of

7    questions, some of it a little bit theatrical.

8    That's all a complete distraction.  We have not

9    brought a harassment claim.  We have not brought a

10   demotion claim.

11           Ms. Kerr may have thought that she had been

12   harassed or been demoted.  She may have said that in

13   her earlier communications with the EEOC years ago.

14   Maybe she was right, maybe she was wrong, but that's

15   not what we're here about today.  We've brought one

16   claim, and that's that her discharge was unlawful.

17           And some other things that you also aren't

18   asked to decide on that verdict form, you're not

19   asked to decide anything about Jason Morris' career

20   or his family members.  You won't be asked to decide

21   whether the rent-to-own business model is defined to

22   help customers or not the way Mr. Kober explained to

23   us at great length the other day.

24           And, for heaven's sake, you're not going to

25   be asked to decide anything about the Free Masons.

1   You're not going to be asked to decide what role the

2   Masons had in Amber Shumate's move, whether it was an

3   officially sanctioned project of the Lodge, or

4   whether it was members of the Lodge helping somebody

5   out.  That has nothing to do with this case.  Those

6   are distractions.

7           The reason the defendant, I think, is

8   spending so much more time on those issues and so

9   much more time generally with all the witnesses,

10   bringing up every possible issue under the sun, is to

11   muddy the waters.  They're throwing spaghetti at the

12   wall and hoping something sticks.

13           Now, the question, the basic question that

14   you are going to be asked is the one that you just

15   saw on the verdict form, and that's Question 1:  Was

16   Megan Kerr's transgender status a motivating factor

17   in Rent-A-Center's decision to discharge her.

18           Ladies and gentlemen, the evidence in this

19   case shows that the answer to that question is yes.

20   Jason Carnahan didn't want a transgender employee in

21   one of his stores.  It's that simple.  We know that

22   because that's what he told Russell Kasper, the store

23   manager at the time.  Carnahan knew it was illegal to

24   fire somebody for that reason, so instead he wanted a

25   legitimate looking reason to fire her for instead.

1          He told Mr. Kasper to find something on her

2     and to make sure it wasn't little things and to make

3     sure that it was well documented.

4          Now, before I get too much further into my

5     closing, I want to emphasize one very important thing

6     from the instructions that you were just given.  This

7     is a civil case and, as the judge told you, the

8     burden of proof is a preponderance of the evidence.

9     You may have heard elsewhere a different standard for

10    criminal cases, but here we work with a preponderance

11    of the evidence.

12         And as you just heard, and as you see in

13    the instructions that you have, this just means

14    finding that something is more probably true than not

15    true, and the same language that it's more likely

16    true than not.  So if you can imagine the scales of

17    justice, this just means that the evidence sits more

18    in favor of one fact than against it.  It doesn't

19    need to be beyond a reasonable doubt.  It doesn't

20    even need to be a lot more likely.  It just needs to

21    be more likely by at least some amount.

22         So if a fact is -- if the probability that

23    something is true is 51 percent and the probability

24    that it's not true is 49 percent, it's more likely

25    true than not.  That's a preponderance of the

1    evidence, 51 percent.

2              Mr. Kasper.  So let's talk about

3    Mr. Kasper.  Maybe he didn't have the best sales

4    numbers and maybe he sometimes mistakenly used the

5    wrong pronouns for Ms. Kerr.  Maybe he did it a lot.

6    That's not really part of this case.

7              At the end of the day, Mr. Kasper is a hero

8    here.  He did the right thing by protecting Ms. Kerr

9    for nine months when he refused to go along with what

10   Mr. Carnahan was trying to do.  This is a man who

11   served in the Air Force, who, after he got fired from

12   Rent-A-Center, went to work for Lincoln Challenge

13   Academy.  That's the army contractor that runs the

14   boot camp for troubled youths.  He's a good man.

15             But Rent-A-Center needs you to dislike him,

16   and so they've told you he was a bad store manager.

17   They had people say unkind things about him and that

18   his store was in last place in the district.

19             Well, first of all, where his store was,

20   where is the evidence of that?  Rent-A-Center is a

21   big company.  We know they have all kinds of sales

22   data.  Mr. Morris said that he looked at that sales

23   data before he started the store manager position,

24   but they didn't show you any of that hard data this

25   week.  What you have to go on is the say-so of Mr.

1    Carnahan and Mr. Morris.

2            Mr. Carnahan was pretty light on details

3    about that.  When I asked him, he couldn't remember

4    when it was that he noticed sales in the Rantoul

5    store were falling in 2013.  He also couldn't

6    remember how the store was doing earlier in 2013.

7    Remember, this is what he fired Mr. Kasper over, so

8    those aren't small details.

9            Mr. Kasper had been the Rantoul store

10   manager for several years, but suddenly, in 2013, his

11   sales became a problem right after he refused to go

12   along with what Carnahan was trying to do.

13   Mr. Kasper has no reason to lie to you.  He didn't go

14   looking to get involved in this case.  He's not

15   friends with Ms. Kerr.  They haven't talked since he

16   was fired in 2013.

17           Rent-A-Center is making him out to be some

18   kind of disgruntled employee who is out to get the

19   company.  You saw him.  You can judge for yourself.

20   He's moved on with his life.  He's not a vindictive

21   person.

22           Now, most of the time people don't have any

23   way of knowing what their boss might be saying to

24   other managers about them at work.  Normally you're

25   not in the room for that.  In this case we know what

1    Jason Carnahan said to Mr. Kasper because Mr. Kasper

2    came here and told you the truth.

3         That's not the only way that we know what

4    was going on here.  Another way we know that the

5    company engaged in unlawful discrimination here is

6    that the explanation that their managers, Jason

7    Carnahan and also Jason Morris, are giving you isn't

8    believable.

9         They say, and Rent-A-Center is going with

10   their story, that Ms. Kerr was fired for using a cube

11   truck for personal reasons on Sunday, July 21st,

12   2014.  Let's take these one by one.

13        First let's talk about Mr. Carnahan.  So,

14   now, it's important to remember that Mr. Carnahan is

15   the decisionmaker here.  He's the one who made the

16   decision to terminate Ms. Kerr.  Rent-A-Center has

17   made a big effort to try and shift your focus to Mr.

18   Morris and to a whole bunch of other people during

19   this trial.

20        Mr. Morris is the face of the company at

21   this trial.  He's been sitting at counsel table all

22   week.  You've heard this long biography from him when

23   he was on the stand, his career at Rent-A-Center and

24   how he wants to move up.  And seemed like he was on

25   the stand forever, and they didn't spend quite as

24

1   much time with Mr. Carnahan.  You need to ask

2   yourself why.

3             Incidentally, Rent-A-Center has put all

4   these other people on the stand, you know, many of

5   them have admitted that they don't personally have

6   any knowledge of why Ms. Kerr was fired.  They

7   weren't involved in the decision.  The people like

8   Elena Reeves and Marcie Bussman, who didn't appear

9   here but gave their deposition, these are probably

10   perfectly decent people.  They weren't involved in

11   the decision and they acknowledged that themselves.

12             The company is putting all these people up

13   here because they don't want you to focus on the

14   person who actually is the decisionmaker, and that's

15   Jason Carnahan, not Elena Reeves.  Jason Morris was

16   doing what he was told, but he wasn't the ultimate

17   decisionmaker.  That was Jason Carnahan.

18             Now, Mr. Carnahan, when he was here on the

19   stand, he agreed that he was the one who made the

20   decision to fire Ms. Kerr.  And now I just want to

21   address one point, because you remember his regional

22   director was this man David Leavengood who was above

23   him and did sign off on the decision.

24             But Mr. Carnahan agreed, when I asked him,

25   that Mr. Leavengood was a rubber stamp.  It was just

1    a quick phone call.  Mr. Leavengood asked him

2    questions.  Mr. Carnahan agrees, and the evidence is

3    clear, the decision by Rent-A-Center to fire Ms. Kerr

4    was made by Mr. Carnahan.

5            Now, Mr. Carnahan's story about that Sunday

6    back in July 2014 doesn't make very much sense.  He

7    says that he received a phone call out of the blue

8    from Mr. Morris that Sunday morning informing him

9    that the cube truck was missing and Ms. Kerr's car

10   was in the parking lot instead.  And despite

11   everything that you've heard this week, that a ten

12   thousand pound cube truck being missing is a very

13   serious matter and cause for deep concern, witnesses

14   went on about that at length, Mr. Carnahan oddly

15   didn't seem very concerned that Sunday.

16           You heard from Daniel Roling -- he was the

17   one who was on the golf course with Mr. Carnahan that

18   day -- that Mr. Carnahan didn't even stop playing the

19   Facebook game that he was playing when this call came

20   in.  According to Mr. Carnahan, when he spoke with

21   Mr. Morris that day, he told Mr. Morris that he only

22   needed to look for the truck if he had time.

23           Remember that?  Now, if this is really that

24   serious a matter, why would the instruction to the

25   store manager be, you know, if you have time see if

1    you can find the truck.  Not credible.

2             And then after the call ended, his golf

3    game resumed.  That's fine.  Nothing wrong with golf.

4    But even more bizarre, later that Sunday he never

5    followed up again to say, hey, did you find the

6    truck?  If the store really is, oh, my gosh, we have

7    no idea what happened, somebody stole the truck,

8    wouldn't you ask later in the day did you find it?

9    He didn't.

10            And despite the fact that he knew that

11   Mr. Morris lived in Champaign, twenty-five minutes

12   away from Rantoul, give or take, Mr. Carnahan

13   testified, these are his words, that it didn't strike

14   him as odd in any way that Mr. Morris was in the

15   parking lot of the Rantoul store on a Sunday morning

16   when it was closed.  He admitted he didn't even think

17   to ask Mr. Morris why did he happen to be in the

18   parking lot on a Sunday.

19            In reality, that's because this story isn't

20   true.  The reason that Mr. Carnahan was not surprised

21   by any of this and went back to his golf game is that

22   he knew full well what was going on.  Ms. Kerr was

23   making the delivery that Mr. Morris had discussed

24   with her the night before.

25            Now, you'll be getting the exhibits in this

1    case when you deliberate, and one that you should

2    look at carefully and evaluate for yourself is

3    Plaintiff's Exhibit 3, which is Mr. Carnahan's

4    declaration.  Remember this is that statement made

5    under penalty of perjury back on December 15th, 2015.

6            I'm not going to go through the whole thing

7    now, but I encourage you to look at it as carefully

8    as you like when you're deliberating.

9            Let's take a look, and, first of all,

10    you'll also see, I'll get to it in a moment, but you

11    also have Jason Morris' declaration from the same

12    day, December of 2015, and you can look at the

13    language and they say pretty much exactly the same

14    thing at certain points and you can evaluate for

15    yourself what's going on there.

16            Now, here in court both Mr. Carnahan and

17    Mr. Morris suggested that the decision to fire Ms.

18    Kerr was really made on Monday, only after Mr. Morris

19    talked to Ms. Kerr first to see her side of the

20    story.

21            In fact, let's take a look at paragraph 8

22    of Mr. Carnahan's declaration.  Earlier in his

23    declaration, under penalty of perjury, what he said

24    was, at paragraph 8:  On Sunday, July 20th, 2014,

25    Mr. Morris contacted me by phone and reported that

```
1    Ms. Kerr had taken a Rent-A-Center vehicle for

2    personal use and not on business hours, which is an

3    automatically terminable offense.  During our

4    discussions, this is the discussion with Mr. Morris

5    that day, we both agreed that Ms. Kerr should be

6    terminated for violating the company policy, i.e.,

7    using the company vehicle for personal reasons.

8            They made that decision right then and

9    there on Sunday.  They didn't need any more

10   information.  They didn't wait to talk to Ms. Kerr

11   the next morning because they knew what was going on.

12   Similar statements in Mr. Morris' declaration.

13           So now let's talk about Mr. Morris.

14   Remember, after Ms. Kasper was fired in December of

15   2013, Mr. Carnahan, and it was Mr. Carnahan who chose

16   Mr. Morris, remember, chose Mr. Morris to take over

17   the store as store manager in February 2014.

18           Now, the Court just instructed you about

19   drawing inferences from fact.  So if you know one

20   fact is true, you can infer that another fact is

21   probably true.  And we think you should do that here.

22   Here you can reasonably infer that if Mr. Carnahan

23   told one store manager, Kasper, to look for a pretext

24   for firing Ms. Kerr and make sure it was not little

25   things and make sure it was well documented,
```

1    Mr. Carnahan probably told the next store manager

2    something very similar.

3              Unlike Mr. Kasper, though, Mr. Morris came

4    through.  You got to hear Mr. Morris.  Again, he may

5    not be the source of the discrimination here.  That's

6    Carnahan, not Morris.  But Mr. Morris, you heard him

7    at great length.  He's definitely eager to please.

8    He explained at length how he wants to move up in the

9    company.

10             And his story that he told you about

11   July 21st is also just not credible.  His story is

12   that he had a suspicion the Saturday before that, as

13   luck would have it, prompted him to drive by the

14   Rantoul store to check on the vehicles, and that

15   particular Sunday, of all the Sundays, that Sunday,

16   he just happened to have a sense that Saturday that

17   he should check the store the next morning, even

18   though it involved going to Rantoul, he lives in

19   Champaign, and lo and behold his suspicion was right.

20   The truck was missing and Ms. Kerr's car was there

21   instead.  And unless he's a psychic, that would be

22   quite the lucky guess.  But he's not a psychic.

23             You may have heard the expression that

24   sometimes the simplest explanation is probably the

25   one that's true.  The reason he knew to look that

1    particular Sunday is because he had talked to Ms.

2    Kerr the day before and handed her the keys and

3    okayed the delivery.

4            Now, suppose, though, for a minute that

5    Mr. Morris had actually been suspicious that Saturday

6    as he says, that's really what was going on.  It's

7    not, but suppose.  If he was, he admitted he could

8    have just checked the keys before he left to make

9    sure that they're there, but he admitted he didn't.

10           Now, they say that Elena closed the store

11   that day.  Well, he could have asked Elena, hey, make

12   sure to look for the keys before you close.  He

13   didn't do that either.

14           Now, Carnahan also told us, by the way,

15   that if Mr. Morris truly had a suspicion on Saturday

16   that this was going to happen, that Ms. Kerr was

17   going to steal a truck, that Mr. Morris, under the

18   company's policies, would have been obligated to

19   report that on Saturday, not wait till the next day

20   to do something about it.

21           And Mr. Morris was asked about that on the

22   stand, well, why didn't you do something on Saturday?

23   You might remember, Mr. Shultz asked him about that,

24   and he tried to explain it away by saying, well, the

25   store is really busy on Saturday and it wasn't until

1    later after he left work that he was able to process

2    what was going on.

3            Come on.  What's there to process?  If you

4    think someone is going to steal a truck, do you

5    really need to think about it later?  When did he

6    process it?  At the county fair later that night?

7    His story isn't true.

8            One of the exhibits that you'll have to

9    look at, as I just mentioned, is also Mr. Morris'

10    declaration.  And again, that's also, you'll see,

11    when you have a chance to look at it, you'll see it's

12    from the same date in December 2015.

13            In his declaration, look at paragraph 7.

14    Here in paragraph 7, he says that, in this first

15    sentence here, Saturday, July 19th, 2014, I noticed

16    that Ms. Kerr was acting unusual.  She made several

17    requests to go out on deliveries alone, even though

18    the customer account representative who was

19    responsible for deliveries was at work.

20            Well, first of all, we know that Ms. Kerr

21    was put on deliveries so it's not like the customer

22    account representative is the only person in the

23    store who does deliveries.  They have two delivery

24    vehicles, which suggests that deliveries can be done

25    by more than just one person.  Let's look at that,

1    requests.

2            And also I should mention, we also heard

3    testimony, one person deliveries, which he also said

4    he was suspicious about that day, that's not uncommon

5    for Rent-A-Center people, for its employees.  That's

6    not an issue.

7            But again, in paragraph 7 here, Mr. Morris'

8    testimony is that Ms. Kerr was making requests to go

9    out on deliveries, that that was what made him

10   suspicious.

11           Mr. Morris was the store manager.  He could

12   have just told her no.  He could have just denied the

13   requests.  This isn't true.  This is not what

14   actually happened.

15           Mr. Morris also explains his suspicion in

16   this declaration, in this second sentence, maybe the

17   third sentence of paragraph 7, sort of in the middle

18   here.  At the time, I was aware that Ms. Kerr had

19   been evicted from her place of residence and

20   suspected that she was using one of the company

21   vehicles to move personal items, a clear violation of

22   company policy.

23           Well, that explanation didn't really hold

24   up during this litigation because her landlord,

25   Mr. Piekarski, said Ms. Kerr wasn't evicted from her

1    home.  So that's just not true.  He wasn't aware that

2    she was evicted because she wasn't evicted.

3              So Mr. Morris hedged his bets and later on

4    said that he was leaning more towards thinking that,

5    well, she had been evicted from her tattoo shop.

6    Turned out that didn't work either as an explanation

7    because the landlord of the tattoo shop, Ms. Kelly --

8    we saw her video.  She was the one the dog popped up

9    halfway through.  She also said Ms. Kerr wasn't

10   evicted from the tattoo shop.

11             So it turns out neither of those

12   explanations is a very good one.  And it's pretty

13   much undisputed that Ms. Kerr was in Royal, Illinois,

14   that day, moving the two items of furniture for Ms.

15   Shumate.  She wasn't being evicted from her home.

16   She wasn't being evicted from her tattoo shop.

17             Now, we know that she was in Royal that

18   day, partly because Amber Shumate, the customer, came

19   here and told you that herself.  And even Russell

20   Wiedemann, remember he's the -- we actually saw the

21   video.  He's the one who made it abundantly clear he

22   was bitter about his breakup with Ms. Kerr.  Even he

23   acknowledged that Ms. Kerr was in Royal that Sunday.

24   It maybe from the day of what he says she was doing,

25   but she wasn't moving stuff out of an apartment in

1    Paxton or moving stuff out of a tattoo shop.

2           Now, let's look again at Mr. Morris'

3    declaration, paragraph 8, and here he explains his

4    suspicion prompted him to drive by the store that

5    Saturday.  Now, a little farther down in the

6    paragraph, about the fourth sentence in on the fourth

7    line at the end, to document this violation I took a

8    date stamped picture of the parking lot.  Remember,

9    Mr. Carnahan says that he needed good documentation.

10          So let's look at that picture, by the way.

11   That's Plaintiff's Exhibit 5.  Now, do you remember

12   when Mr. Shultz asked Mr. Morris if he added this

13   date stamp at the bottom of the photo?  Mr. Morris

14   said no.  The camera on his phone just did that

15   automatically.  What phone automatically puts a photo

16   on a black background and has a date stamp at the

17   bottom?  His testimony isn't truthful.

18          He added the date stamp because he wanted

19   to make sure he had extra good documentation.  And

20   there was doubt about what day the picture was from,

21   so he put the date down at the bottom.  His phone

22   didn't do that automatically.

23          Now, there's something else that's odd

24   about the photo.  You also heard from Brock

25   Duncan-Fox.  I think that was yesterday.  He was the

1    person who's the account representative, allegedly

2    helped Mr. Morris search for the truck that Sunday.

3    He told you that that photo that I just had on the

4    screen wasn't the photo that Mr. Morris took that

5    day.  He said that he saw Mr. Morris take one photo

6    and that it was from the Rent-A-Center parking lot.

7              Remember, Exhibit 5 is clearly taken from

8    across the street, everybody agrees, across the

9    street at the Auto Zone parking lot.  So if there

10   is -- this other photo, actually one taken that day,

11   why haven't we seen it?  And if it's true that the

12   one photo taken that day isn't Exhibit 5, then what's

13   Exhibit 5?  When was it actually taken?  So there's

14   some fishy, funny business going on with the photos

15   as well.

16             Now, Mr. Morris also said in his

17   declaration that he picked up Mr. Duncan-Fox to help

18   him search for Ms. Kerr and the missing Rent-A-Center

19   vehicle, and so that gave him a witness.  And

20   Mr. Duncan-Fox indeed was a witness.  Let's just be

21   clear.  That is exactly the role Mr. Duncan-Fox was

22   intended to serve, and he did.  Mr. Morris' goal that

23   day was to get a photo, have his witness, and that

24   was what he was doing.  This idea that there was then

25   a two to three hour search for the truck is just not

1    credible.

2             Suppose that they actually had searched for

3    the truck, though.  After they couldn't find it, they

4    just went home.  First of all, I thought they were

5    going to breakfast.  We never heard about them

6    actually getting to breakfast.  After the search for

7    the truck, they just went home.

8             If a ten thousand pound cube truck, if your

9    story is really that this important truck is missing,

10   dangerous that it's missing, you have no idea where

11   it is, A, why not call the police?  B, why not wait

12   in the parking lot for her to come back.  Ms. Kerr's

13   car is parked there.  She's coming back.  Why

14   wouldn't you wait to make sure that it comes back.

15   They didn't.  They went home because they knew where

16   the truck was and they weren't actually concerned

17   about it.

18            Now, you'll also see Plaintiff's Exhibit

19   1 -- I'm going to put it on the screen for you --

20   that's a statement by the company's representatives

21   that accepts the story that Mr. Morris and

22   Mr. Carnahan give.  So it's -- the story that we're

23   talking about is the company story as well.  You'll

24   have that.  You can look at it yourself.

25            In reality, we know that Mr. Carnahan and

1   Mr. Morris weren't aware of any eviction by Ms. Kerr

2   because there were no evictions.  They made those

3   things up.  Now, it is true, Ms. Kerr did at some

4   point move out of her apartment in Paxton.  No debate

5   about that.  She did that after she got fired from

6   Rent-A-Center and her boyfriend up north asked her to

7   move in.

8          There is zero evidence that she used a

9   Rent-A-Center truck to move her personal belongings

10  out of that apartment, and there's zero evidence that

11  she used a Rent-A-Center truck to move items out of

12  her tattoo shop when that closed.

13         You heard from Jennifer McCallister.

14  Remember, she was the employee at the accounting

15  office next door to where the tattoo shop used to be

16  who said that she only works on weekdays outside of

17  tax season.  In July she'd only be there on a

18  weekday, and she said that she knows that Ms. Kerr

19  moved her stuff out on a weekday because she saw it

20  and she's only there on weekdays.  She also said Ms.

21  Kerr used a personal vehicle with a trailer attached

22  to it, not a Rent-A-Center truck.

23         Now, Ms. Kerr moved out of these places

24  after she was fired from Rent-A-Center.  It's true,

25  Mr. Piekarski, I believe you heard from him a couple

1    days ago, he did express some uncertainty about when

2    exactly in the summer Ms. Kerr moved, and they have

3    now blown that up into, ah-ha, she was planning to

4    leave all along because Mr. Piekarski said, well,

5    maybe she called me in June, maybe it was July.

6              But even Mr. Piekarski acknowledged in a

7    previous sworn statement, that he had made under the

8    penalty of perjury, that he was not sure.  He thought

9    Ms. Kerr moved out sometime in August.  So that's not

10   evidence that Ms. Kerr was secretly planning on

11   leaving the area at that point.

12             And, by the way, I'm only going to touch on

13   this briefly, but another distraction that

14   Rent-A-Center has engaged in, which is really just

15   puzzling, is getting into Ms. Kerr's rent.  They put

16   into evidence Mr. Piekarski's rent ledger and they

17   talked about that some.  And other than trying to

18   make her look bad for being behind on her rent, I

19   really have no idea what that's intended to prove.

20             It's true Mr. Piekarski's ledger had no

21   rent for that July, and so I think they're seizing in

22   on that.  But, first of all, his rent ledger was

23   incorrect, and we've put in as Plaintiff's

24   Exhibit 12, which you'll get to see, a copy of a rent

25   receipt.  Ms. Kerr did pay her rent in July 2014.

1            Second of all, the whole idea that Ms. Kerr

2    was planning on leaving anyway, and so just didn't

3    care about getting fired just doesn't hold water.

4    And one way you can tell that is that it's

5    contradicted by Ms. Kerr's ex, Mr. Wiedemann.  Mr.

6    Wiedemann testified that right after she was fired --

7    this is in the video so it's really easy for us to

8    coming to a clip so I want you to focus on this.

9            Mr. Wiedemann testified that after Ms. Kerr

10    was fired she complained to him right after it

11    happened.

12            Question:  What did she tell you?

13            Answer:  She had said that she had

14    permission to use the truck and something about -- I

15    don't recall exactly.  Something about being set up.

16            Question:  And do you remember when that

17    conversation occurred?

18            Answer:  It was shortly after she was

19    dismissed.

20            So what the evidence shows is that Ms. Kerr

21    was already complaining about the fact that she had

22    been fired right after she had been fired.  Even her

23    ex, who is otherwise not her friend in this lawsuit,

24    is saying that.  This idea that, oh, Ms. Kerr was

25    okay with being fired because she was headed out of

1     town anyway, it's just not true.

2          What the evidence does show is that Ms.

3     Kerr was making a delivery to Ms. Shumate that

4     Sunday.  It was the delivery that somebody, we have

5     no idea who, put in the daily activity planner.

6     Remember, the daily activity planner is that paper

7     book that records the delivery schedule for three

8     months at a time.

9          And Mr. Trusevich keeps saying that Ms.

10    Kerr said it was Mr. Kasper who did this, I'm sure

11    you're going to hear that over and over again, but

12    Ms. Kerr's already told you that she was obviously

13    wrong when she guessed that maybe Mr. Kasper knew

14    this agreement.

15         Mr. Kasper wasn't working at the store in

16    February.  We know that's not correct.  So Ms. Kerr

17    misspoke.  She's acknowledged that, and for them not

18    to be able to let it go, it's a distraction.

19         You heard from Amber Shumate, the customer.

20    She corroborates that Ms. Kerr made a delivery of a

21    brown sectional sofa and a bed frame that weekend

22    that July in a Rent-A-Center truck.  And

23    Rent-A-Center's own internal records, which is the

24    receipt record that you saw, Plaintiff's Exhibit 4,

25    Rent-A-Center's own records confirm that Ms. Shumate

1    did indeed buy just such a sofa and bed frame from

2    Rent-A-Center.  And when Ms. Kerr redelivered the

3    merchandise on July 21st, she was wearing a

4    Rent-A-Center red polo shirt.

5              First of all, if this really wasn't work

6    and this is just, you know, a day off, why would she

7    be wearing the uniform on her day off?  Who wears

8    their work uniform on their day off?  And

9    Rent-A-Center accuses Ms. Kerr of moving Amber

10   Shumate's other belongings, too, that day.

11             Now I can go on to the third story.  Since

12   the evictions didn't work and since there is actually

13   evidence that Ms. Shumate had purchased merchandise

14   from Rent-A-Center, now the accusation is that, well,

15   Ms. Kerr must have been moving other belongings of

16   Ms. Shumate's in the truck that Sunday.

17             And that's not credible for several

18   reasons.  So, first of all, Mr. Carnahan, Mr. Morris,

19   in their declarations, and the company in its

20   position statement, which is Exhibit 1, their claim

21   was that she was moving her own personal belongings,

22   not Ms. Shumate's.  That wasn't their story.  So they

23   changed their story.  That's their number one.

24             And, second, the only evidence that

25   Rent-A-Center has given you in this trial that Ms.

1    Kerr was moving anything that day other than the

2    couch and the bed frame is the testimony of her ex,

3    Russell Wiedemann, and even that wasn't very clear.

4              Now, Mr. Wiedemann, by his own admission,

5    had a bad breakup with Ms. Kerr.  He admitted that he

6    couldn't tell you exactly what was in the truck.  He

7    saw some boxes and totes.  That's as clear as he got.

8    He doesn't know what was in those.  Couldn't tell you

9    how many there were.

10             And he told you himself that his memory was

11   not very good.  He said, quote, it just seems like

12   some things are foggy.  Some things are foggy and

13   some things are not, and then he continued, I might

14   not recall what I did three days ago.  Ladies and

15   gentlemen, that's not reliable testimony.

16             Now, Rent-A-Center is trying to suggest

17   that Amber Shumate is friends with Ms. Kerr and so

18   she's in on it.  They said that because they need a

19   reason for you to disbelieve Ms. Shumate as well.

20   But they're twisting the facts here.  Ms. Kerr and

21   Ms. Shumate were not friends at the time these events

22   happened in 2014.

23             They both acknowledged they became friends

24   later after Ms. Kerr was terminated, but there is no

25   evidence that they were buddies at the time that

1   we're talking about, July 2014.

2   Rent-A-Center has no evidence suggesting otherwise.

3   And even later, it's not like they were close

4   friends.

5          And, also, let's think about the timing

6   here.  Mr. Wiedemann, again the ex, said that he

7   broke up with Ms. Kerr in May of 2014, and we know

8   that Ms. Shumate and Ms. Kerr were acquainted through

9   Mr. Wiedemann because he introduced them once or

10  twice.

11         So in July of 2014, just after they'd

12  broken up, Ms. Shumate was a friend of Ms. Kerr's ex.

13  That was the relationship in July 2014.  Who risks

14  their job of nine years to help out a friend of an ex

15  you broke up with who you met just a couple of times?

16  People don't do that.

17         Now, really the biggest part of

18  Rent-A-Center's case, though, is the claim that it's

19  actually Ms. Kerr and the EEOC who have been

20  inconsistent in this case.  So let's take those one

21  by one.

22         First, the redelivery of the Rent-A-Center

23  furniture happened in connection with Amber's move.

24  That part's clear.  Rent-A-Center makes a big deal

25  about the fact that Ms. Kerr has described that move,

1    Ms. Shumate's move, as the project of either a

2    charitable organization or it was a community service

3    project, or it was something that the Masons helped

4    with.  Those are all just different ways of saying

5    the same thing.

6              Could Ms. Kerr have been more careful in

7    the way she described this?  Yes.  But Mr. Wiedemann,

8    who was formally a master of the Masons Lodge

9    himself, described the Masons as, quote, the world's

10   largest charitable organization.  He also said we do

11   all we can to help the community.

12             And when he was asked are you aware of

13   civic projects that the Lodge decides to do, his

14   answer was absolutely.  So it sounds like Ms. Kerr

15   was mistaken and she thought that this was some type

16   of project of the Masons Lodge.  In reality, it was

17   just some people from the Lodge.  It wasn't anything

18   official.

19             But Ms. Shumate corroborated that there

20   were indeed a number of members of the Masons Lodge

21   there that day, including Mr. Wiedemann, and people

22   he knew assisting with the move.  So Ms. Kerr has not

23   been inconsistent about this.  She's used different

24   words to describe the same thing, but it doesn't

25   matter.  Ms. Kerr mistakenly thought that it was

1    something the Lodge was helping with rather than

2    members of the Lodge.  Big deal.

3           Now, there is one statement that you hear

4    over and over and over again that refers to helping

5    Goodwill rather than the Masons, and it also contains

6    that weird reference to homeless people or a church.

7    Mr. Trusevich repeats it over and over and over again

8    because it sounds the most inconsistent, but it's

9    also very misleading because everybody agrees Ms.

10   Kerr didn't write that.  Let's take a look at that.

11   That's Defendant's Exhibit 42.

12          You'll be able to look at it more closely

13   during your deliberations, but this is, I think, the

14   third page of the exhibit.  And this is hard to read,

15   but these are these notes of the interview that some

16   Illinois Department of Employment Security person did

17   with Ms. Kerr in connection with her unemployment

18   application.

19          And it is confusing because this is phrased

20   in terms of "I was told" and "we did that," and so

21   the implication that I think that's trying to be put

22   to you is that, oh, well look at what Ms. Kerr said.

23          But everybody agrees, Ms. Kerr didn't write

24   that.  I'll show you Exhibit 11, which is a

25   stipulation.  Remember, we know that a stipulation is

1    an agreement by both parties.  So there's no dispute

2    that this is true.  It's a principal adjudication

3    summary.  It's a document we just saw on the screen.

4             It's a document prepared by an Illinois

5    Department of Employment Security adjudicator at or

6    near the time of IDES' August 18, 2014, phone

7    interview with Ms. Kerr.  Ms. Kerr didn't write those

8    notes.  We don't even know the name of the person who

9    wrote those notes.  We don't know if they were having

10   a bad day.  We don't know if they did one interview

11   that day or a hundred interviews that day.  Were they

12   writing up their notes the next morning and confusing

13   different interviews?

14            We have no idea, and it doesn't matter.

15   The fact that some person at the Illinois Department

16   of Employment Security wrote Goodwill instead of the

17   Masons is totally irrelevant to anything you're

18   deciding in this case.

19            Now, they've also talked a little bit about

20   the fact that the EEOC has used different phrasing.

21   They put up a copy of the complaint, the document

22   that begins the lawsuit here in court.  And what I'll

23   say about that is this.

24            So from documents that the defendants

25   themselves have put into evidence, which you will

1   have, we don't normally tell you a whole lot about

2   what happens before the trial, but just from the

3   things they've put into evidence you can tell that

4   there were a number of steps that happened before the

5   trial this week.

6          You saw the intake questionnaire that Ms.

7   Kerr filled out.  I think it was in September 2014.

8   Probably in a waiting room at the EEOC somewhere.

9   You saw the charge that she then formally filed with

10  the EEOC a whole week later in 2014.  You heard some

11  talk that there was an investigation by the EEOC, and

12  then you saw, I think they put it in as an exhibit,

13  the complaint that the EEOC filed.  It's referred to

14  as the lawsuit.  It says complaint at the top.  It's

15  one of their exhibits.  You'll see it.  That was in

16  2016.

17         And then from this week you've heard more

18  than you probably care to about depositions that have

19  happened in the last couple of years.  From the date

20  you've seen videos taking place, you know there were

21  a lot of depositions that happened between that

22  complaint and between this week and now, of course,

23  we're here.

24         The EEOC was not on the scene in Rantoul in

25  2014.  We were not at Amber Shumate's house in

1    Rankin, Illinois, in July 2014.  So what we know we

2    know from witnesses, just like you.  And just as you

3    know a lot more about this case right now than you

4    did four days ago, we, too, know more than we did a

5    year ago, two years ago, or three years ago.

6              So if we put Masons in a document from

7    2016, who on earth cares?  The evidence that you are

8    supposed to consider is the evidence that was

9    presented to you this week at trial.  That's the

10   evidence that's going back with you.  That's the

11   evidence that counts.

12             What the evidence shows is that

13   Mr. Carnahan wanted Ms. Kerr out because he didn't

14   approve of her transition and told Mr. Kasper to find

15   things to write her up for and make sure they were

16   documented.  Mr. Kasper didn't go along with that,

17   and he got fired.

18             Mr. Morris came along, did what

19   Mr. Carnahan asked.  Then Mr. Morris gave Ms. Kerr

20   permission to use the truck that Sunday, documented

21   the fact eight ways to Sunday, and then fires her the

22   next day.  That's discrimination, and Rent-A-Center

23   should be held accountable for it.

24             You heard about two items that might have

25   helped further aid in your deliberations but which

1    either Rent-A-Center threw out, in any event we've

2    never seen.  Mr. Morris admitted that he threw out

3    the daily activity planner from that July, that paper

4    delivery book.

5              Now, if you were the store manager and you

6    were firing an employee for alleged misuse of a

7    delivery vehicle and if you have nothing to hide, why

8    would you throw out the only record of what the

9    legitimate deliveries were that month.

10             Mr. Kasper also told us he was a diligent

11   note keeper and kept notes of all of these

12   conversations, including his conversations with

13   Mr. Carnahan.  And when he got fired he asked if he

14   could keep his notes, and he was told no.  We have

15   not seen those notes this week.  You can draw your

16   own conclusions.

17             Now, despite all of that, let's just

18   suppose for a minute that you don't believe our case

19   and that you believe Ms. Kerr actually was using the

20   truck that day without permission.  I think there's

21   very little evidence of that, but just suppose for a

22   moment.  Even if that's true, there is still evidence

23   of discrimination.

24             So Mr. Carnahan said both at his deposition

25   and here the other day that Ms. Kerr had to be fired

1  because violating the company's policy against

2  personal use of the vehicle results in automatic

3  termination.  No exceptions.  That's just false.  You

4  heard not one but two separate examples, right here

5  in central Illinois, of store employees violating

6  this policy and either getting a verbal warning or no

7  discipline at all.

8          You heard from Michael Moreland two days

9  ago and then again yesterday.  He's the one who used

10  a Rent-A-Center delivery vehicle to go visit

11  Harley-Davidson store to go on a shopping errand.

12  There's nothing wrong with that, nothing wrong with

13  Harley-Davidson, but doing it with a Rent-A-Center

14  truck is a violation of their policy.  There's no

15  dispute about that.

16          There's also no dispute that Mr. Moreland

17  received no discipline whatsoever.  There's this

18  debate about did he continue to work for the rest of

19  the day or did he continue to work for another week,

20  but what's undisputed is that they didn't fire him.

21  They didn't give him a warning.  Nothing.

22          Rent-A-Center claims that this is because

23  this was his last day anyway and so they let him keep

24  working to the end of the day.  First of all, if the

25  policy really is automatic termination, no

1    exceptions, why do you let the person keep working

2    till the end of the day?  Ms. Kerr wasn't allowed to

3    keep working till the end of the day when she was

4    fired.  Mr. Kasper wasn't allowed to keep working

5    till the end of the day when he was fired.  We

6    haven't heard about anybody who was allowed just, oh,

7    keep working for a little while after you get fired.

8            Ms. Kerr -- oh, and there was a little

9    drama yesterday morning.  You know, Mr. Moreland also

10   told you that his recollection, that it wasn't the

11   rest of the day but it was another week or so that he

12   worked there.  And when he was on the stand

13   yesterday, we saw eventually his mind went through

14   some extremely tragic events in his life, which is

15   really neither here nor there for us, but it clearly

16   affected him.  And after that, the attorney kept

17   pressing him about the dates.  Given the experience

18   that he just described, who would remember anything

19   when their mind is going back to that?  So I'll let

20   you decide for yourself what happened yesterday.

21           What we do know is that Nakia Bell, she's

22   one of the other defense witnesses you saw yesterday,

23   she testified that two nights ago, halfway through

24   the trial, she went and found some records about

25   Mr. Moreland and they put those into evidence, and

1    that was to try and disprove the idea that he

2    continued working for another week after the

3    Harley-Davidson trip.  Records aren't infallible.

4    She admitted herself, it's human beings that type the

5    information into those records.

6            But even set aside Mr. Moreland, we also

7    heard an example from Mr. Morris himself about an

8    employee he himself didn't fire, even though the

9    employee violated the same policy.  That's Greg

10   Holly.  Mr. Moreland told us that Mr. Holly had used

11   a Rent-A-Center vehicle to drive a co-worker to a

12   recording studio.  There's no dispute that is not

13   Rent-A-Center business.  It's a violation of the

14   policy.

15           Now, Mr. Morris claimed here that the

16   reason Mr. Holly didn't get fired is because, well,

17   he came right back to work, he did the right thing

18   and he went right up to Mr. Morris and he informed

19   him about the violation.  Well, that's just not what

20   Mr. Morris said in his deposition.  Mr. Shultz read a

21   question and answer from Mr. Morris' deposition.  Let

22   me show it to you.

23           So the question:  How was he stealing time?

24   That's a reference to Greg Holly.  Actually, that may

25   be a reference to the other person at the recording

1    studio.

2              In any event, the answer continues:  He was

3    trying to make an album.  That's Greg Cannon.  So

4    they basically went out together to do deliveries.

5    The other guy, Gregory Holly, just dropped him off at

6    the studio, did the delivery, and would come back and

7    pick him up.

8              And then look at these next two things in

9    quotes.  Do you know where Cannon is at?  And the

10   second thing is no.  I dropped him off at his studio.

11   So I dropped him off at his studio is clearly Holly,

12   and the first part is the question from Morris.

13   Otherwise it doesn't make any sense.

14             So what this is is Morris said do you know

15   where Cannon's at.  Holly said no, I dropped him off

16   at the studio.  This wasn't Holly just coming up and

17   volunteering this information.  Mr. Morris told us at

18   his deposition that he found out about this because

19   he asked Mr. Holly.  The reason that's important is

20   because that's exactly what he says Ms. Kerr did.

21             Remember, their story is that after Ms.

22   Kerr violated this policy on Monday morning, she came

23   in and Mr. Morris asked him, hey, were you using the

24   truck yesterday?  And his testimony is that she

25   admitted it, right then and there, without any

1    equivocation.  So if that's true, that she just said

2    yes, then how is that not just like Mr. Holly, who,

3    when he was asked, fessed up.  If their story is that

4    Ms. Kerr, too, just acknowledged it right after being

5    asked, then why were the two of them treated

6    differently?

7         Ms. Kerr is transgender.  That's one

8    difference and that was a factor.

9         Now, Rent-A-Center has also spent a very

10   large amount of time trying to show you that Ms. Kerr

11   failed to make an internal complaint to the company

12   or didn't complain hard enough within the company

13   first.  She didn't call the 800 number to complain

14   about her termination.  She didn't, I guess, e-mail

15   the CEO back or whatever.

16        But, ladies and gentlemen, this is also a

17   distraction.  Ms. Kerr had no obligation to make a

18   complaint within the company before coming to the

19   EEOC or coming to court.  The judge gave you what the

20   law is and what the rules are.  You have a copy.

21   Look all the way through that.  There's nothing in

22   there that says in order to prove her case that Ms.

23   Kerr had to have made a complaint to the company

24   first.  That's a distraction.  But also the 800

25   numbers?  Really?  That's what they expected her to

1    do?

2              The depositions you heard yesterday, there

3    was one that was read from the stand and there was

4    that video I think of Ms. Clatterbuch that you saw at

5    the end.  The one down in Texas.  Even they said --

6    and it's a little hard to follow just listening in

7    depositions, but even they said -- they go for

8    Solution Center, which is the company's call center,

9    even they both said that you wouldn't call the

10   Solution Center about discrimination.

11             Ms. Torres, that was the one that was read

12   from the stand, she's the director of the Solution

13   Center, she testified that she did a search of all --

14   they have records of all the calls that are made to

15   the Solution Center.  They refer to them as tickets.

16   She said she did a search of all the tickets in the

17   Solution Center, and that covers hundreds of

18   thousands of calls that the Solution Center has

19   received, and she searched for complaints of

20   discrimination and she told you that she came up with

21   zero.  People don't call the Solution Center to

22   complain about discriminatory discharge.  That is a

23   total distraction.

24             In any event, Ms. Kerr did make a

25   complaint.  You know from the intake questionnaire

56

1    that they put in and the charge of discrimination

2    they put in that Ms. Kerr, just a couple of weeks

3    later, came to the EEOC and complained that she

4    thought there was something fishy about her

5    termination.  So she did complain.

6           Let's talk about the verdict form.  First

7    question that you need to answer is, of course,

8    Question 1, and that is:  Was Megan Kerr's

9    transgender status a motivating factor in

10   Rent-A-Center's decision to discharge her?

11          We think the answer to that is clearly yes.

12   Of course it was a factor.  Mr. Carnahan himself

13   acknowledges that he was the one who made the

14   decision for Rent-A-Center to terminate Ms. Kerr.

15   When we're talking about Rent-A-Center's decision

16   here, we're talking about Mr. Carnahan's decision.

17          Now, what does motivating factor mean?  The

18   court has given you a definition of what motivating

19   factor means, and that's just that it's something

20   that contributed to Rent-A-Center's decision to

21   terminate Ms. Kerr's employment.  Doesn't need to be

22   the only factor, but it needs to be a factor and, of

23   course, it was a factor here.

24          Now, the next question -- and so we believe

25   you should answer the first question yes.

1          The second question is:  Would

2    Rent-A-Center have made the same decision to

3    discharge Megan Kerr even if it had not considered

4    her transgender status?  And we think the answer to

5    this is clearly no.

6          Rent-A-Center has not offered any evidence

7    at all to prove this.  And look carefully at the

8    instructions because on Question 2 Rent-A-Center has

9    the burden to prove by a preponderance that the

10   answer to Question 2 is yes.  They haven't presented

11   any evidence of that.  If Ms. Kerr was still Jason

12   Kerr, we wouldn't be here today.  The company would

13   not have done this.  So the answer to Question 2, we

14   would urge you to answer no.

15          And then on the verdict form, if you answer

16   that way the next question is about damages,

17   compensatory damages.  As you've been instructed,

18   there's no exact standard for compensatory damages.

19   There's no formula we can give you.  That may be

20   frustrating, but we rely upon your judgment and your

21   evaluation of the evidence to decide what amount will

22   make up for what Ms. Kerr went through, what she went

23   through emotionally, as a result of being fired from

24   her job or more than nine years.  And, remember, by

25   Jason Morris' own admission, she was the best

58

1   employee in the store.  She's proud of her work.

2   This is not a small thing to lose her job.

3            Now, of course, there's cases that involve

4   very serious harm, for example, where somebody might

5   be severely or physically injured, and that could

6   possibly involve very large amounts for damages,

7   maybe in the millions.  That's not this case.  We're

8   not claiming that.

9            There's also cases that could involve very

10  small amounts of harm where maybe the amount needed

11  to make up for that is just in the thousands.  We

12  don't think that's the case either.  We think this

13  case is somewhere in the middle.  Ms. Kerr lost her

14  job, after all, a job that had been part of her life

15  for more than a decade.  But the exact amount is up

16  to you.

17           Finally, punitive damages.  So there's two

18  questions on this.  Question 4 is, first:  Are

19  punitive damages appropriate?  Now, you also got

20  instructions, they were towards the end, that gives

21  you the standard for punitive damages, and punitive

22  damages, it says, are appropriate if Rent-A-Center

23  acted in reckless disregard of Ms. Kerr's rights, and

24  it then explains what that means.

25           It says essentially that that means that

1    Rent-A-Center did what it did knowing that it may

2    violate the law.  You may remember the questions that

3    Mr. Shultz and I asked Mr. Carnahan and Mr. Morris,

4    were you aware at the time that it was illegal to

5    fire somebody because of transgender and they said

6    yes.  So there is no doubt that if they did that,

7    they were doing it knowing that what they were doing

8    was illegal.  So there was reckless disregard.

9            In the next paragraph you'll see, and I'm

10   not going to go through every paragraph of it only

11   because you have it in writing, you'll be able to

12   look at it for yourselves, but it says if punitive

13   damages are not appropriate that Rent-A-Center proves

14   that it made a good faith effort to implement an

15   antidiscrimination policy.

16           The most important word in that sentence is

17   implement.  We have heard a lot this week about all

18   the nice policies that the company has, e-mail from

19   the CEO, trainings that they do, and all those

20   things.  But are those policies actually enforced?

21   Are they actually enforced against higher up managers

22   like Jason Carnahan?  There's no evidence whatsoever

23   of that.  So there is no evidence that Rent-A-Center

24   implemented a policy of nondiscrimination.

25           It's also important to focus on what the

60

1    purpose of punitive damages are.  And as you were

2    instructed, the purposes of punitive damages are to

3    punish the defendant for its conduct and to serve as

4    an example or warning, either to the defendant or

5    others, not to engage in similar conduct in the

6    future.

7            That's important because -- so, now,

8    compensatory damages, remember, are to make up for

9    what Ms. Kerr went through, for the emotional

10   distress she experienced.  And she absolutely

11   deserves compensation for that.  No doubt in my mind.

12           But punitive damages is a little bit

13   different.  Punitive damages have to do with making

14   sure that Rent-A-Center doesn't do something like

15   this again and try to get away with it with respect

16   to the other twenty thousand people who still work

17   there at all the stores across the country.  We

18   believe, given the company's failure to take any

19   responsibility in this case, it's appropriate to set

20   an amount of punitive damages to serve as a warning

21   to the company not to engage in this in the future.

22           Again, the amount is up to you to come up

23   with a formula.  For context, I'll remind you this is

24   a large company.  You heard some facts read to you

25   the other day that are agreed on, and one of them is

1    that for the most recent year that we have

2    information for the net worth of the company is just

3    about $265 million.

4              So in summary, there is no dispute Ms. Kerr

5    was a good employee.  She was hard working.  She's

6    somebody who honorably served her country.  She was

7    just trying to earn a living at Rent-A-Center, be a

8    contributing member of society.  That's what we want

9    people to do in this country is earn a living.  She

10   was doing that.  She got fired because of who she is.

11   That's not right, and we ask you to find in favor of

12   the EEOC.  Thank you.

13             THE COURT:  All right.  Thank you,

14   Mr. Mulaire.  Ladies and gentlemen, are you okay?

15   Ready to go with the next one?  Anybody need a break?

16             All right.  For Rent-A-Center.

17   Mr. Trusevich, you may proceed.

18             MR. TRUSEVICH:  Thank you, your Honor.

19   I am hoping today that I will actually be shorter

20   than the other side.  I first want to say good

21   morning to everybody.  My name is Andy Trusevich, and

22   along with Stephanie Quincy and Rent-A-Center, on

23   behalf of them I just want to say thank you for your

24   time, but especially on behalf of Jason Morris, Jason

25   Carnahan, Elena Reeves, thank you for the time.  We

1    appreciate it.

2          Ladies and gentlemen, everything -- what's

3    interesting and one thing I just want to address,

4    what Mr. Mulaire just told you five minutes ago, he

5    stood up here and he looked at you and he said just a

6    couple of weeks after she was fired she filled out

7    her intake questionnaire.

8          Look at Exhibit 15.  I guarantee it's not a

9    couple of weeks.  It's four months.  He says things

10   that in order to talk about a distraction he wants

11   you to believe that, well, when she was fired she

12   kept this story, and within a couple of weeks was his

13   words just now because I wrote it down, and he said

14   that she filled out her intake questionnaire.  You'll

15   see it's stamped received at the EEOC in November,

16   four months later.

17         Ladies and gentlemen, I wanted to say thank

18   you because EEOC sued Rent-A-Center and Rent-A-Center

19   is a business.  And what is a business?  It's bricks

20   and mortars.  Bricks and mortars aren't what make a

21   business.  It's the people that make the business.

22         And he says, oh, it's an e-mail.  They try

23   to downplay everything that was done this week.  If

24   something doesn't agree with the EEOC, they're liars.

25   If somebody at the unemployment agency writes

1   something down, well, then they're mistaken.  They

2   were just busy that day.

3            You all have to decide whether when she did

4   that interview with the unemployment did somebody

5   really get it that wrong or did they get it right.

6            And it's made up of people.  And they say,

7   oh, some e-mail from Mark Speese.  It wasn't an

8   e-mail.  You all saw that.  It was the Mark Speese,

9   chairman of the board and CEO, and Mitch Fadel, the

10  chief operating officer, letter that went to all the

11  co-workers, and you all saw that and it was about

12  respecting the workplace.

13           You heard from Dan Kober, Dave Leavengood,

14  Jason Carnahan, Jason Morris.  He just said that

15  there was no evidence that any EEO training was

16  implemented to Mr. Carnahan.  I think I beat that

17  dead horse with witnesses on is training assigned,

18  and they all talked about yes, to my COE.  It's

19  assigned.  We have to do it within a certain time.

20           But I wanted to focus on that Mark Speese,

21  the chairman of the board, CEO, and Mitch Fadel memo.

22  And they said it went out yearly.  And if you look at

23  that memo, it's that respect in the workplace, to

24  treat people fairly.  And I said does leadership

25  start from the top down?  And you can't get any

1  higher than that, I guess, unless you look at the

2  board of directors.

3         And what does that respect in the workplace

4  mean?  Treating people fairly.  That people shouldn't

5  discriminate or harass other people.

6         But, ladies and gentlemen, there's a flip

7  side to that.  Treating people fairly also means that

8  when people are falsely accused of discrimination,

9  employers should stand up for their employees.  If

10 they're falsely accused, treating people fairly is to

11 defend them also.

12        Ladies and gentlemen, I submit that's

13 exactly what this case is about.  Mr. Mulaire says

14 that, oh, we talk about distractions.  We have to

15 show you the picture of what Ms. Kerr was claiming in

16 order for you to decide who is telling the truth.

17        And let's look at that.  The EEOC and Ms.

18 Kerr have alleged, falsely accused some really good

19 people of some bad things.  They accuse Jason

20 Carnahan back over there and Jason Morris of

21 discriminating against someone because she's

22 transgender.  They label them co-conspirators.  They

23 label them as not telling the truth, meaning that

24 they're liars.  They say Elena Reeves over there is

25 not telling the truth, that Brock Duncan-Fox is not

1    telling the truth.

2              What are these false allegations based on?

3    Let's look at that.  Mr. Mulaire loves -- I think he

4    said distractions at least ten times in his closing.

5    Let's look at what the evidence is and see if those

6    are distractions.

7              Ms. Kerr has told so many different

8    versions of what she was doing with that truck on

9    that Sunday, July 20th of 2014, and it is important

10   to know why are these shifting versions?  Why is she

11   telling different versions?

12             He says, oh, don't believe the state

13   unemployment records where it clearly says in the

14   record, it says the time that contact was made, an

15   interview was held with her.  She admitted that was

16   her phone number.  She admitted that she had that

17   interview.  And what they're asking you to believe is

18   just disregard the State of Illinois.

19             Oh, we don't know, some adjudicator who

20   does this, he or she must have just got it wrong.

21   And what did Ms. Kerr tell them?  That she was moving

22   homeless people from a church to a shelter and

23   Goodwill was involved.  Then she said she was moving

24   a dislocated family.  We know that's untrue.  Amber

25   Shumate wasn't dislocated.  She wasn't homeless.

1            Another version is a charitable or civic

2    event organized by the Masons.  We know that's not

3    true.  What Mr. Mulaire just came up and told you is

4    not what the evidence showed.  Cash Wiedemann, he

5    said, threw in here in his closing, oh, there were

6    ten Masons or so there.  Nobody has identified a

7    single Mason, and that is in their lawsuit.

8            When they falsely accused Rent-A-Center of

9    discrimination, they're the ones who put in their

10   lawsuit or in their interrogatory answers and

11   Mr. Shultz sitting there is the one who verified it

12   under oath.  That is Exhibits 3, 4, and 5, and you

13   will see verification that, under penalty of perjury,

14   that lawyer said, yep, it was a charitable event for

15   the Free Masons.  So take a look at that.

16           That's not even Ms. Kerr's version of that.

17   Mr. Shultz adopted a charitable event or civic event

18   organized by the Masons.  We know Cash Wiedemann said

19   that's absolutely not true.  You heard from

20   Mr. Thompson to get up here saying if it was a

21   charitable or civic event he would know about it.  It

22   simply didn't happen.  It's one of her changing

23   versions of events.  The Masons had nothing to do

24   with that.

25           The next version, moving Amber Shumate

1    because Russ Kasper made a prior commitment.  And

2    Mr. Mulaire said, oh, Mr. Trusevich is going to get

3    up there, and he anticipated this because that is one

4    of her versions of events.  You saw that in her

5    deposition.  She said that Russ Kasper made this

6    commitment.  I had nothing to do with that

7    transaction for Amber Shumate.

8              Well, Amber denies that, Kasper denies

9    that, and we know it couldn't have happened because

10   Kasper wasn't even there when she did it.  But Amber

11   and Megan are friends, and I submit the evidence

12   shows they both came in and said, oh, we're not

13   friends now.  I believe the evidence shows they are

14   absolutely friends.

15             Amber and Megan are friends.  Megan Kerr

16   discounted that merchandise, and instead of putting

17   it under Amber Wilkerson, meaning Amber Shumate's

18   maiden name, instead she -- and he showed you the

19   receipt.  Instead in the system she listed under Amy

20   Wilkerson so if someone is searching for Amber

21   Wilkerson they couldn't find that receipt.

22             So Ms. Shumate comes in and says, oh, I go

23   by Amy, that's my nickname, but when she was

24   questioned about that by Ms. Quincy and said your

25   Facebook, do you ever list your name as Amy anywhere

1    in your Facebook?  The answer was no.  Do you have

2    anything on you, like a driver's license or anything,

3    that you could show the jury that you go by Amy?  No.

4           Then Ms. Kerr comes in and says just the

5    opposite.  Oh, well, Amy is her legal name but Amber

6    is her nickname.  And why did Ms. Shumate do that?

7    She was trying to help a friend explain why her

8    friend put that different name intentionally into the

9    system under Amy Wilkerson.  Because she discounted

10   that furniture.

11          Then another version.  She tells Elena that

12   she was donating her furniture to veterans.  That's

13   another version.  And Mr. Mulaire says why would

14   Rent-A-Center get rid of that book?  Mr. Morris did

15   that.  How unfair for Mr. Mulaire to get up here and

16   say that Jason Morris should have kept the book.

17          I will show you, if you look at the

18   original charge, which is Exhibit 6, look at that

19   charge.  That's what the EEOC told Rent-A-Center this

20   case was about.  Rent-A-Center never knew anything

21   that the EEOC was going to sue and claim that Ms.

22   Kerr had permission to take the truck that Sunday.

23          Look at the charge, the date of the charge,

24   until the public lawsuit was filed in July 2016.

25   There's not a single e-mail from these gentlemen.

1    There's not a single text, letter, or anything else

2    that ever told Rent-A-Center that Ms. Kerr was

3    claiming that she had authorization to do a Sunday

4    delivery.  And then to come in and say, well, during

5    that two year period he should have known somehow, be

6    clairvoyant, to keep the DAP.  Tell us.  Tell us --

7    when Ms. Kerr told them, tell us and we would have

8    saved the DAP.

9         And then they say, well, you don't have

10   that Facebook message anymore, do you, Ms. Reeves?

11   During the two year period, tell us that and so we

12   could have at least asked Ms. Reeves, hey, would you

13   mind saving that Facebook message where she said

14   she's donating furniture to veterans.  That is

15   absolutely unfair.

16        Then she says, well, I was moving from a

17   mini storage facility located one mile from the

18   Rent-A-Center store, yet she couldn't remember where

19   the name of the store was or the facility.  And I

20   asked her, I said, well, you told me that on January

21   17th, 2017, in your deposition.  I said, Ms. Kerr,

22   since then, knowing that you are going to be at

23   trial, have you done anything to try to locate that,

24   and she said no.  And we all know, I submit, why she

25   never looked.  Because it doesn't exist.

1               Then she says on one of the unemployment

2      forms, they want you to believe the person who -- the

3      adjudicator got that wrong, but I showed you two

4      forms that she electronically signed.  Same form,

5      same questions, yet different answers.  On the second

6      one she said Jason Morris actually scheduled the

7      event.

8               To support their allegations, they bring in

9      Mr. Russ Kasper.  And, by the way, if you have any

10     doubt that Mr. Kasper says it was roughly every week,

11     all you have to do is look at Exhibit 1.  That's

12     their lawsuit that the EEOC puts in.  In paragraph H,

13     the EEOC is the one who says roughly weekly,

14     Mr. Carnahan, starting in March of 2013 until

15     December of 2013, that's nine months, roughly weekly

16     that Mr. Carnahan over there would call Kasper and

17     say what's the status of finding something to

18     document so we can get rid of Ms. Kerr.

19               That is simply incredible.  How can you

20     believe that for nine months, roughly every week --

21     let's say roughly every week.  I say it's weekly, but

22     let's say it's every other week for nine months.

23     Yet, he doesn't say anything to anybody.  He doesn't

24     call his RD.  He doesn't call the 800 numbers.  They

25     make fun of the 800 numbers.  I am proud that

1    Rent-A-Center has those 800 numbers that you can call

2    to co-worker relations or to an outside company,

3    Global Compliance.

4            You heard -- I'm not going to put that

5    poster up again, you all have seen that how many

6    times -- the different avenues you can call.  And he

7    never calls anybody for nine months?  He never tells

8    anyone?  And they say, oh, he's just a disinterested

9    witness.  But that he says and claims, oh, I told

10   Elena Reeves.  I told Elena Reeves, my assistant

11   manager, that Jason Carnahan was telling me this.

12           Ms. Reeves absolutely denies that.  Is it

13   really credible for a store manager that roughly

14   every week that his PM is telling him to fire someone

15   because she's transgender and he says, yeah, I'm

16   going to document this.  In fact, he even said he

17   would write these instructions when Jason Carnahan

18   was telling him in person.  He said I would write

19   down these instructions in person.

20           He gets two PIPs, one in October and one in

21   November.  Elena Reeves says he openly talked about,

22   yeah, he knew he was going to get fired because his

23   store, the evidence, Mr. Mulaire, the evidence was

24   uncontested that that store was at the bottom of the

25   barrel.  Everybody knew, that has testified, said

1    that Mr. Kasper's store ranked not only at the bottom

2    of the district but at the bottom of the region.  And

3    Mr. Kasper even stood up and said, will I take

4    responsibility?  Yeah, it was going bad.

5              In the PIP he agreed.  He says there's no

6    evidence.  The PIP is saying here's the district

7    average.  Here's your average.  You don't see Mr.

8    Kasper signing at the bottom saying that's not true.

9    That's untrue.  And if he thinks he's going to be

10   fired and Mr. Carnahan is telling him to do something

11   that's illegal or against company policy, really?

12   You're not going to call somebody, your own DM who

13   promoted you, Dan Kober, and say, Dan, help me out

14   here.  Dan, can you help me out here?  Marcie

15   Bussman, can you help me out here?  What am I

16   supposed to do?

17             And he says now it was slitting my own

18   throat so I wasn't going to do it.  But yet he

19   attended the January 2012 Respecting the Workplace

20   seminar, because we know he initialed it, that Dan

21   Kober held in 2012.  And he knew that worked.  He

22   knew the reporting procedures.  But then let's say,

23   okay, he didn't want to, quote, slit -- I would be

24   slitting my own throat.

25             Okay.  What about after you're fired?

1   After you're fired and you have nothing to lose, what

2   did he call him, a hero?  After you're fired and you

3   have nothing to lose, if that really happened, a hero

4   would immediately call somebody and say I need to let

5   you know Jason Carnahan has been telling me every

6   week to fire her because she's transgender.  I need

7   to let someone know.  When's the first time he ever

8   told anybody?  Two years later when the EEOC called

9   him.  Two years later, twenty-four months later when

10  the EEOC called him, that was the first time he told

11  anybody.

12          Kasper says he documented these

13  instructions in his either journal or MFR, Memo for

14  Record.  Yet, when he knew he was going to be fired,

15  two PIPs, he didn't take a copy.  He didn't take them

16  home.  I asked Elena, what was his demeanor when

17  Jason Carnahan drove up after Black Friday?  And she

18  says he started shaking.  He knew he was going to be

19  fired.

20          Ladies and gentlemen, if any document like

21  that existed, he would have went in there and gotten

22  that document.  He would have either copied it, he

23  would have taken it home beforehand.  That document

24  never existed because that man never told him that.

25  It doesn't make any sense.

1          They say Rent-A-Center wants to describe

2     him as a disgruntled individual.  No.  He's angry at

3     Mr. Carnahan for firing him and that's the

4     motivation.  He's angry at Mr. Carnahan.

5     Mr. Carnahan put him on two PIPs.  He didn't think it

6     was his fault that his store was failing, and he gets

7     fired after Black Friday.

8          When Ms. Quincy asked him, did you ever

9     record any of these conversations when he called you?

10    No, of course not.  He has to say that because they

11    never happened.  Who wouldn't record that?  Maybe not

12    after -- if it's roughly every week for nine months,

13    maybe you don't record the first time, the fifth

14    time, the tenth time, but don't you think by the

15    twentieth or twenty-fifth or thirtieth, you know

16    what, I'm just going to hit record.

17         Whose cell phone today doesn't have, even

18    December of 2013, can't push a button and record a

19    phone conversation?  What's that, Mr. Carnahan?  Do

20    you want me to get rid of her because she's

21    transgender?  You've been telling me this roughly

22    every week?  Really?  You don't believe a person like

23    Mr. Kasper would have the wherewithal to record a

24    single conversation if that happened?

25         And then after he's fired, after he's

1    fired, when he says I didn't want to slit my own

2    throat, talk about theatrical.  And after he was

3    fired, he didn't say a word to anyone.  Even when he

4    runs into Elena at Wal-Mart after he's fired and

5    Elena says -- he says how's it going and she says,

6    oh, well, Megan Kerr was let go.

7            If that was true what was happening, he

8    would have told Elena, you know what, that doesn't

9    surprise me at all.  Carnahan was trying to get rid

10   of -- telling me to get rid of her roughly every week

11   for nine months.  And I'll go through that theory in

12   a minute.  But he doesn't tell Elena when they run

13   into each other at Wal-Mart.  It just doesn't make

14   sense.

15           Anybody can accuse anybody of anything at

16   any time.  So and so is a thief.  So and so is a

17   bigot because they discriminate.  But the nice thing

18   in this country is if you're going to accuse somebody

19   and bring a lawsuit, you have the burden of proof.

20           Here the EEOC has utterly failed to show

21   that Ms. Kerr's transgender status was a motivating

22   factor for the decision to terminate her employment.

23   What evidence have they brought on that they have

24   failed to show that her transgender status

25   contributed to Rent-A-Center's decision to terminate

1   her employment?  All they can do is point to some

2   decent people and just call them, well, you're

3   bigots.  You discriminate and you're liars.

4           You heard from the witnesses, Dave

5   Leavengood, Dan Kober, Jason Carnahan, Jason Morris,

6   Brock Duncan-Fox, Elena Reeves, on how she was

7   treated, that Ms. Kerr was treated fairly.  If all

8   this stuff was happening, they say, oh, all the

9   harassment that she's claiming is a distraction.  No,

10  it lets you know who's telling the truth.  If all of

11  this stuff is going on, that people were referring to

12  her as bad names and Elena was telling her this,

13  somebody would have complained if that was going on.

14          And then they say there's no evidence that

15  she was treated the same.  Really?  You heard from

16  Nakia Bell, who testified that ninety-six other

17  people from 2012 until just last month were fired for

18  using a company vehicle.  Ninety-six, ladies and

19  gentlemen.

20          And then look at the one, Dan Kober.  Talk

21  about apples and apples.  Dan Kober, one year -- this

22  is before Ms. Kerr's termination.  Dan Kober tells

23  you about the story where a female store manager sees

24  a box truck going down the street on a Sunday and she

25  gets suspicious so she goes back to the store and

77

1      sees Raymond Paine's car there and the box truck is

2      missing.  What does Kober tell her to do?  Snap a

3      picture.

4              When Jason Morris does it and Carnahan does

5      it, it's a conspiracy.  But they don't say anything

6      about Kober and Paine.  So he tells the store manager

7      to snap a picture of it.  I asked Mr. Kober, did you

8      go look for it?  No.  We knew Andy Paine's car was

9      there and he was going to have to come back and get

10     it and we addressed it the next day.  How did you

11     address it?  He was fired.  He was fired.  Talk about

12     apples to apples.

13             I think we can agree that if someone is

14     transgender they shouldn't be discriminated against,

15     but we can also agree that just because someone is

16     transgender doesn't mean that they get a free pass of

17     the law or a company policy.  She took the truck

18     without permission, got caught and was fired, like

19     ninety-six other people.  Like Raymond Paine.

20             I can just imagine if employees at Hertz or

21     Budget or U-Haul or Lowe's just started taking

22     vehicles or trucks that when the store closed and on

23     Sundays that nothing would happen to them.  Really?

24     Really?  Companies are going to allow that?

25             You heard testimony how dangerous the

```
 1    automated lift gates can be and co-workers have to go
 2    through training.  He says, well, if that's the case,
 3    why wouldn't they call the police?  Dan Kober, I
 4    asked him that.  Did you call the police on Raymond
 5    Paine?  He says no, I'm not going to do that.  Yet,
 6    if they did call the police, they would be in here
 7    saying that, oh, Rent-A-Center retaliated against her
 8    by calling the police.  You can't win for losing.
 9              She says that she only put -- Ms. Kerr says
10    she only put the seven pieces of furniture in the box
11    truck -- the three piece Ashley chocolate vista
12    couch, the headboard, the footboard, and the side
13    rails.  Seven pieces.  Really?
14              Cash Wiedemann testified, and he wants to
15    discount Cash Wiedemann's testimony, oh, he's a
16    disgruntled former boyfriend.  His testimony, you all
17    saw his testimony.  Did your breakup or anything
18    affect your testimony?  He says no.  And that's,
19    ladies and gentlemen, you're the judges of
20    credibility.
21              Mr. Wiedemann said that he saw the truck
22    and it was loaded with other stuff in there.  And it
23    only makes sense.  If there was all these other
24    Masons, ten to twenty other Masons, then why meet the
25    RAC box truck for seven pieces of furniture.  She
```

1    went and moved her friend and used it like a free

2    U-Haul.  That's exactly what happened.

3          The EEOC then tries to point to Holly and

4    Moreland as proof that she was treated differently.

5    And you read the deposition.  Mr. Morris explained

6    that, and that is a misrepresentation.  At his

7    deposition he explained exactly what happened, that

8    Holly did drop Cannon off, that they were supposed to

9    go do a delivery.  And Cannon said, hey, drop me off

10   at the recording studio, you go do the delivery, and

11   then come back and pick me up and no one will know.

12         He drops Cannon off and immediately turns

13   around, goes back to his store manager, and he tells

14   Jason Morris, ask me where Cannon is.  And so he

15   says, where's Cannon?  He goes, I dropped him off at

16   the recording studio.

17         He was a new employee.  He came in.  He

18   immediately reported.  He shouldn't have been fired.

19   And Cannon was immediately fired, and they want to

20   say Mr. Holly not being fired, you go from here to

21   here that that is proof of transgender

22   discrimination.  Ladies and gentlemen, that's not

23   even apples to oranges.

24         Then poor Mr. Moreland, the EEOC that says,

25   I mean, they trotted him in here and they wanted him

1    to say that, yep, I worked another week after RJ

2    Harding was fired.  The evidence clearly shows RJ

3    Harding was fired on July 6, 2012.  And when he came

4    back and he was shown his last paycheck, he was shown

5    the time card, that really didn't refresh his

6    recollection but then he said, you know, this last

7    paycheck, I remember now that it was more money in

8    there and I went back to the store and asked about

9    more money and he realized it was because his

10    vacation pay had been paid out and it refreshed his

11    recollection.

12         And then Nakia Bell testifies that she

13    looked at the time records and the payroll.

14    Moreland's last day was the same as Harding's,

15    July 6th, 2012.  And then finally when I said, I know

16    I'm probably kicking a dead horse, I asked Ms.

17    Reeves, Ms. Reeves, were you there on Holly and

18    Cannon's last day?  She said yes.  I said was it

19    their last day, and Ms. Reeves says absolutely.  So

20    either she's coming in here and lying to all of you

21    or there's no doubt, Moreland's last day.

22         So then they say, and because of theatrics

23    yesterday that Mr. Moreland had to change his

24    testimony, then they say, well, but he was allowed to

25    work the rest of the day.  Of course he was.  Dan

1    Kober said if you fire two people at the same time,

2    it's going to leave the store short staffed.  Harding

3    was fired.  Moreland had given his two week notice.

4    That was his last day, so they let him work out the

5    remainder of the day, and they say that is proof of

6    transgender discrimination.

7           Then say, well, it's RAC shifting stories.

8    Well, ladies and gentlemen, there's an old saying,

9    punching in the dark.  For two years the EEOC -- look

10   at the charge, what they're saying.  And Ms. Kerr

11   testified that they drafted the charge and sent it to

12   her.  The EEOC drafted it.  Why didn't they tell

13   Rent-A-Center, you know what, this is what she's

14   claiming.  She's claiming that the store manager gave

15   her the keys or whatever different version that day,

16   but put Rent-A-Center on notice.  Let them know what

17   the allegations are.

18          From that time, from the time of the

19   charge, and it's in evidence, until they filed their

20   public lawsuit in July of 2016, they never once said,

21   hey, she had permission.  And so they say, well,

22   Jason Morris says he knew she had been evicted.  He's

23   not a lawyer.  His mom's a lawyer.  But did he go and

24   see it in any papers or anything?

25          I asked him, do you still believe to this

1    day, when he was testifying, that she was using a

2    truck to move her personal stuff that day, and he

3    said absolutely.  And you heard Mr. Piekarski.  Mr.

4    Piekarski says she told me she was leaving at the end

5    of July.  But they want to discount Mr. Piekarski.

6            Look at Exhibit 6, the EEOC charge.  It's

7    dated November 2014.  Look what they told

8    Rent-A-Center.  This is what her complaint is.  And

9    the EEOC typed it up.  They purposely, purposely, did

10   not put her allegation in there about having

11   permission to do any delivery on a Sunday.  Read that

12   charge, and then look at the lawsuit two years later

13   that they filed.

14            Then the EEOC -- he made a cheap shot

15   saying the EEOC kept Mr. Morris here as the company

16   rep all week, as the face, and they want to tell you

17   that Mr. Carnahan picked him as the store manager,

18   meaning that Mr. Carnahan was looking for someone

19   that was malleable, that he could get to fire

20   someone.  Really?  Really?  Jason Morris?

21            Jason Morris set her up?  A young man

22   raised by a single mom who decided to go to law

23   school later in life with two young boys that lived

24   in, during that law school, lived in Orchard Downs

25   graduate housing at the local university down the

1    road.

2              And Mr. Morris described during those

3    formative years, who were your friends?  And he said

4    my friends were from all over.  And I said all over

5    here?  And he says no, all over the world.  Different

6    countries, different backgrounds, different cultures.

7    While his mom was attending law school, those were

8    his friends growing up.  And the EEOC looks you in

9    the eye and says that young man raised by her is the

10   type of person who would discriminate against someone

11   because they're transgender.

12             Described his openly gay brother as his

13   best friend and he said I would not want my brother

14   treated differently.  That's why I would not do this.

15   He wouldn't want his brother treated differently.

16   The way he was growing up, and I said how were you

17   growing up, and he said my mom raised me up.  That's

18   a good young man.

19             By the way, Mr. Carnahan was asked, when

20   Jason Morris was your store manager before Megan Kerr

21   was fired, did you know that Jason Morris' mother was

22   a local attorney?  He said yes.  They want you to

23   believe that Carnahan was telling Morris fire her

24   because she's transgender and, really, he's never

25   going to tell his mom the lawyer?  Really?

84

```
 1              Then we go to Jason Carnahan.  They said,
 2   oh, they didn't talk to him much.  Jason Carnahan, a
 3   man who worked his way up to become a DM, responsible
 4   for the district, he gave Kasper two PIPs, a chance
 5   to improve.  They said, oh, that last one -- they
 6   like to use percentages instead of saying in three
 7   days you have to increase your sales by eight sales
 8   in three days, the Thursday, Friday, Saturday.
 9              You heard from Kober, a good store manager
10   should be able to do that in one day.  So they like
11   to use the percentages.  He signed it.  He agreed to
12   it.  He didn't say this is impossible, boss.  He
13   signed it.  And there's no question that Jason
14   Carnahan gave Kasper chance after chance trying to
15   increase sales in the store.  After Black Friday,
16   Kasper is fired.
17              Now, at this time, remember, I call it
18   their nine plus two plus five theory, the EEOC's
19   theory.  For nine months, the mastermind over there,
20   Mr. Carnahan, wants to get rid of her.  So for nine
21   months he's telling Kasper roughly every week to fire
22   her.  When he won't, he gets rid of Kasper, according
23   to the EEOC, as their theory goes.
24              So this is a missed opportunity.  What
25   could Mr. Carnahan have done at this point?  He could
```

1   have said to Dave Leavengood, you know, boss -- and

2   there's testimony on this.  You know, boss, I want to

3   get rid of the whole sales team.  Megan Kerr was the

4   assistant manager of sales at the time.  You know,

5   the store is at the bottom of the district, bottom of

6   the region.  I want to go ahead and replace the store

7   manager and the assistant manager of sales and bring

8   in a new sales team to get this store turned away.

9   Never once.

10          Never once did Carnahan suggest that.  What

11   does he do after he fires Kasper?  And here, ladies

12   and gentlemen, this is where their case literally --

13   it doesn't go off the tracks.  It goes off the cliff.

14   They're telling you that for sixteen months he was

15   looking for every way to get rid of her.

16          After Kasper is fired, he does just the

17   opposite of what the EEOC is accusing him of.  And

18   being accused of discriminating against someone,

19   being a discriminator, is one of the worst things

20   someone can be accused of.  At least if you're

21   accused of being a thief -- remember the old Les

22   Miserables, Jean Valjean stole a loaf of bread for

23   his starving sister, you can at least make that

24   sympathetic.

25          If you're accused of discrimination, of

1    being a bigot, there is no sympathy there.  And

2    that's what they're accusing, it rolls off their

3    tongue so easily, that for sixteen months you were

4    trying to get her fired because you are a bigot.  You

5    wanted her gone because she was transgender.  And

6    where does it go off not the tracks but the cliff?

7            As soon as Kasper is fired, Carnahan puts

8    Megan Kerr in charge of that store, just the very

9    opposite of what Mr. Mulaire and Mr. Shultz -- and

10   they can't explain that.  What would that -- why

11   would he put Ms. Kerr in charge?  And when I asked

12   her that, she admitted it on the stand.

13           So from the beginning of December until

14   February, now another two months go by, so nine, ten,

15   eleven, trying to get rid of her for nine months,

16   turns around in midair, mind you, puts her in charge

17   of running the store, and yet they're saying, yes,

18   Jason Carnahan would do anything to get rid of her

19   because she's transgender.

20           You heard, Ms. Kerr even admitted, I said

21   what days did he switch you off?  To Wednesdays.

22   What days do the store managers have off?

23   Wednesdays.  Elena Reeves testified that when Jason

24   Carnahan would call the store who would he talk to.

25   Ms. Kerr even admitted it.  Yes, when he would call

1    he would talk with me because she was put in charge.

2    That defies logic in this case.  How do you explain

3    that?  How can the EEOC explain that Jason Carnahan

4    wanted him gone for sixteen -- wanted Megan Kerr gone

5    for sixteen months, and then puts Megan Kerr in

6    charge during that two month period?  How can they

7    explain that?  They can't.

8            And Elena backs him up on that.  Elena

9    says, and again unless you believe Elena Reeves just

10   came in and lied that, yeah, when Carnahan would call

11   in that's who he would talk to, Megan Kerr.  He would

12   talk to her.  Why?  Because she was in charge.

13           Then Morris is hired in February of 2014.

14   He's hired because he applied for the job.  The EEOC

15   has zero evidence, but they want you to believe, they

16   infer, they drop these little pellets of accusations

17   against people.  Oh, well, he's the one who approved

18   hiring Mr. Morris, meaning he found someone who would

19   play ball and get rid of her after putting her in

20   charge for two months.  So, yeah, nine months plus

21   two.  We're at eleven months.

22           Now, February through July, that's another

23   five months, so what they want you to believe is for

24   sixteen months Jason Carnahan had nothing else on his

25   mind but to get rid of Megan Kerr because she was

88

1    transgender.  And I know you all know this.  As soon
2    as Morris took over, he hit the ground running.
3            They won store of the month in February.
4    Store of the month in April.  You saw the plaques.
5    And I asked Jason Morris and Carnahan was asked, who
6    won those?  We did, the team.  Was he part of the
7    team?  Yeah, he was leading the team.  But was Elena
8    Reeves part of the team?  Sure.  Was Alex Kasapov
9    part of the team?  Sure.  Was Megan Kerr part of the
10   team?  And they said absolutely.
11           Did you value your team for going from the
12   bottom of the barrel to the top of the district?  Why
13   would Jason Carnahan want her out?  Talk about a
14   shifting theory.  They first said, well, it's because
15   customers were leaving.  Well, now they had to change
16   their story because they went from the bottom of the
17   store district to the top of the district.  So now
18   that they can't use that they say, well, it's just
19   because he's a bigot.  Ladies and gentlemen, that is
20   a strong word to accuse someone of.  That is a dark,
21   dark cloud that can hang over people's heads when you
22   falsely accuse someone of bigotry.
23           Brock testified, Jason Morris treated
24   everyone equally.  Oh, the bad things were happening.
25   He went and got a tattoo from Ms. Kerr, a bear next

1    to his daughter's name.  Really?  I mean, that

2    environment that people were treating her so bad?

3    And I said when you were alone with her during that

4    time period, did she ever mention anything that she

5    was being treated unfairly or anything?  Nothing.

6              And, ladies and gentlemen, I think the

7    saddest, saddest part of this case is what Ms. Kerr

8    did to Elena Reeves.  That is the saddest part of

9    this case.  Elena Reeves, who was a confidante of

10   hers, who, the evidence would show, one of the first

11   people Jason Kerr, being presented as a male during a

12   delivery, told his friend that he at that time, he

13   told his friend, Elena Reeves, I'm thinking of

14   transitioning.

15             And what was her answer?  Oh, I'm glad.

16   Why were you glad, Elena?  Because Megan/Jason found

17   himself.  I was happy for her.  Elena even referred

18   to "her," even though it was Jason Kerr at the time.

19   Said I was happy for her.  She found herself.  She

20   found herself.  And I said did you keep your friend's

21   confidence in confidence?  And Elena says absolutely.

22   And there's no evidence that Elena told anybody prior

23   to Megan Kerr.  She let Megan Kerr tell when Megan

24   Kerr was ready.  And when Megan Kerr was ready to

25   tell people, she waited.  And she was a confidante.

1            But that wasn't all that she did.  I said

2    were you excited when she told you this?  Oh,

3    absolutely.  Why?  Because I was excited that she

4    found herself.  I was happy for her.  I said, well,

5    what about when she opened the tattoo shop, were you

6    invited?  She said yes.  I said, did you go?  She

7    goes yes.  Why did you go Ms. Reeves?  Because I was

8    excited for my friend.  My friend was excited to open

9    this tattoo shop and I went to support her friend.

10   She's thinking that she's talking to a friend.  She

11   thinks she's being supportive of a friend.  She

12   thinks she's keeping the confidence of a friend.

13            When Ms. Reeves' friend, Ms. Keer, needed

14   help for transportation to and from work, Ms. Reeves

15   stepped up to the plate once again as a friend.  What

16   did she do?  She sold a car, a red Mitsubishi

17   hatchback.  Gave her the keys before she even took

18   any money to help her friend.

19            I said why did you do that?  Because my

20   friend needed help.  And how does Ms. Kerr repay a

21   friend like that?  By claiming that Brock Duncan-Fox

22   used the truck, the very same truck that she was

23   fired for, the very weekend before to move his

24   belongings into Elena Reeves' house.  Both Brock and

25   Elena deny that.  They denied they ever even dated.

1              Folks, John Travolta in a movie once in a

2     Civil Action played a lawyer and he said if lawyers

3     didn't care about their clients they wouldn't keep us

4     up at night.

5              Ms. Kerr goes and drags her friend and

6     makes up untruths about her and untruths about Brock

7     Duncan-Fox.  Someone who supported her business to go

8     get a tattoo, and she throws them literally under

9     that -- it's not a bus.  She threw them under the RAC

10    box truck.

11             Where is any of this?  Look at Exhibit 15.

12    That is Ms. Kerr's own handwritten intake

13    questionnaire.  Again, he said was a couple of weeks.

14    Take a look at it.  It's November.  She signs it at

15    the end of September, but the EEOC doesn't receive it

16    until November.  It wasn't a couple of weeks.  It's

17    four months later.

18             Where is any of that?  Where are any of

19    those allegations?  Where is it that Jason Morris was

20    treating her like the plague, referring to her as

21    "it."  That Brock Duncan-Fox used the truck, the very

22    same truck, she got fired coincidentally, the Sunday

23    before.  Look in those pages in her handwritten

24    notes, and I will promise you you will not find it

25    anywhere.  And hopefully you don't need the

1    magnifying glass that I needed to read it.

2              Ladies and gentlemen, it's not there.  What

3    is there, he talks about the DAP missing.  They have

4    never explained, nor will they come up here after I'm

5    finished, they're not going to be able to explain

6    where the "see attached" is on the intake

7    questionnaire.  They have never in four years

8    explained where that "see attached" is, where she

9    puts in her own handwriting see attached, see

10   attached.

11             And you heard her testimony.  I said in

12   your deposition you said you mailed it in, along with

13   your EEOC intake questionnaire.  And, ladies and

14   gentlemen, I submit everybody in this courtroom knows

15   why that "see attachment," you will never see it and

16   we've never seen it.  It's yet some other version.

17             And maybe it's the truth version that, you

18   know what, like she told the unemployment commission,

19   when she electronically signed it, not when some

20   adjudicator was doing it but when she filled it out

21   herself, you know what, worse that's going to happen

22   is a verbal counseling.  And I submit that "see

23   attachment," what it says is I took the truck without

24   permission.  I figured the most that would happen is

25   I'd get a verbal counseling.  I got fired instead.

```
 1            And that's what's in that "see attachment."
 2   We've never seen it, and I promise you you're never
 3   going to see it.  And they've never explained it to
 4   this day where it is.  If the government is going to
 5   come up and put a cloud of bigotry over someone and
 6   accuse them, then at least have your house in order.
 7            On the intake questionnaire, ladies and
 8   gentlemen, I had Ms. Kerr on the stand, and I said,
 9   Ms. Kerr, isn't it true you were ready to leave and
10   move up with your now husband, Cain Bana?  Oh,
11   absolutely not.  I said, well, were you going around
12   between July and the end of September and referring
13   to Cain Bana as your spouse?  No.  She looked you
14   straight in the eye from that witness chair under
15   oath and said no.
16            And then I pulled up the intake
17   questionnaire, which she signed two months within her
18   being fired.  She must not have mailed it in because
19   the EEOC didn't receive it until November.  But on
20   the line, you'll see it, it says emergency contact or
21   list somebody that we can contact you through, she
22   lists Cain Bana.  Relationship, spouse.  And I said,
23   ma'am, isn't this what I asked you in front of the
24   ladies and gentlemen of the jury just five minutes
25   ago?  And you all recall what her answer was.  Spouse
```

94

1    can be many things.  It was untrue.  It was untrue

2    under oath as she looked you all in the eye.

3             I said isn't it true you were planning on

4    leaving during that period, meaning February to July?

5    No.  And I asked her again, I continue to repeat

6    myself, but I asked her again and said, are you sure?

7    You weren't planning on moving between February and

8    July?  She said no.  I said so that would be

9    incorrect, and she said yes.  She looked you all in

10   the eye from the witness stand under oath and said

11   yes.

12            Boom, I pull up her e-mails.  She applied

13   in February for a job.  I believe the first one was a

14   legal assistant.  And then she applied in April again

15   as a -- I think it was an estimator or project

16   coordinator.  Again, she told you untruths from the

17   stand.  He wants to call it distractions.  I call it

18   you need to know whether someone is telling you the

19   truth or not.  She was looking to move, and I said if

20   you had gotten one of those jobs, we'd never even be

21   here.  You were looking to leave to be with Cain

22   Bana.

23            And then I said, isn't it true, ma'am -- he

24   said why would anyone risk a nine year employment.

25   And I said, well, isn't it true because you thought

1  the worst would happen if you get verbal counsel?

2  No, that's not true.  So then I show her the

3  unemployment forms that she actually electronically

4  signed.  Not that someone filled out, that she filled

5  out.

6          And the second one, the answers change, was

7  there a policy, yes or no.  Was there a policy?  Yes.

8  She changes those answers.  But then the second one,

9  what did you expect would happen if you got caught or

10  the result of the infraction, and she puts verbal

11  counsel in her own writing.  That's what she thought

12  was going to happen.

13          That's why Mr. Mulaire, to answer your

14  question, is why would someone risk a nine year

15  career?  She didn't think she was risking anything.

16  Plus, she was already looking.  She sent out for two

17  jobs.  How many other places was she looking for?  We

18  only know of two.  Different answers.  Same form.

19  Same question.

20          Frank Piekarski told you that at the end of

21  June or beginning of July, Megan told him I'm going

22  to be moving out in July.  They want to discount

23  that.  You folks are the judge of credibility of a

24  witness.  Either you're going to believe

25  Mr. Piekarski when he said yep, she told me that.  I

1    know she told me either the end of June or beginning

2    of July that she was going to be moving out in July.

3           Mary Ann Kelly, on the video, testified she

4    just moved out.  I had no notice whatsoever.  They

5    say Jennifer McCallister proves that she wasn't using

6    the truck.  Ms. McCallister was the accountant down

7    the road.  She saw a pickup or some flatbed being

8    used during the week when she was there.  I think it

9    was the shortest cross I've done in my career.  I

10   said, Ms. McCallister, were you there the Sunday

11   before to see if the RAC truck was being used?  No,

12   sir.  Were you there the Sunday after you saw that to

13   see if the truck was being used?  No, sir.

14          Then what happens after she's fired?  He

15   says there's no legal requirements to call.  We agree

16   with that, but we know that she called, and again

17   they want to discount this, that, oh, well, you

18   wouldn't call the Solution Center if you're going to

19   complain about discrimination.

20          I asked her in deposition, did you ever

21   talk to anybody live?  No.  Then we find these

22   records and find out three days after, three days

23   after she's fired, you saw Maria Clatterbuch, that

24   three days afterwards she calls to get an expense

25   check and nothing is mentioned about a setup.  He

1    says, oh, she told Cash Wiedemann she was set up.

2              So you have someone from Rent-A-Center who

3    works for Rent-A-Center.  Who cares what it's called.

4    Solution Center, facilities, whatever.  You have a

5    live person on the phone.  I need to speak to

6    somebody.  I was set up.  Never mentioned it.

7              And I asked Ms. Kerr, did you mention it?

8    Nope, wouldn't be appropriate.  Why not?

9              Listen, while I have you on the phone, can

10   you transfer me to HR?  Transfer me to somebody.

11   Because she hadn't cooked up the story yet in three

12   days.  That's why she never mentioned it.

13             And not only in three days did she talk to

14   it, but a week after that she called back to the

15   Solution Center and this time it was to reset her ADP

16   password so she could get a copy of her W-2.  Or W-9.

17   Or W-2.

18             And a week later.  So a week later she's

19   talking to two different live people that work for

20   Rent-A-Center, and she never says transfer me to HR.

21   Let me talk to you while I have you on the phone.

22             And you heard Maria Clatterbuch.  You know,

23   I probably asked her too many times, but she said

24   absolutely.  If she would have told me that, I would

25   have documented it and I would have transferred the

98

1    call to HR.

2              And there is nothing in those documents

3    about any of this moving homeless people or Masons or

4    Amber Shumate or anything else.  Or if you want to

5    simplify it to what Mr. Mulaire said, there is

6    nothing in there saying my store manager gave me

7    authorization to do whatever on Sunday to take the

8    truck.

9              But I can tell you one thing that you're

10   not going to find in that jury charge, it's not our

11   burden to show what she was doing with that truck on

12   July 20th.  I submit the evidence shows she was

13   moving her stuff, whether it was from her residence

14   or from the tattoo shop, she was moving her stuff.

15   She was helping her friend Amber out.

16             And, who knows, whether it was Amber if you

17   get people to help move you and I'll get the truck,

18   you guys help move us.  And I think the reason she's

19   talking about a mini storage unit is she's conflating

20   her personal move on that Sunday where she was

21   getting stuff out of mini storage with the Amber

22   Shumate move because no one can explain that mini

23   storage story.  And she still is sticking by the mini

24   storage.  And I suggest she's conflating it.

25             On that Sunday she went to help Amber

1    Shumate.  And did they go and help her?  Who knows,

2    but she's conflating those stories.  She went to the

3    mini storage unit and got her stuff out that Sunday.

4    And then I asked her again when she was on the stand,

5    I said, was Cain Bana there.  She looked you right in

6    the eye and said no.  So then I showed her an e-mail

7    that she sent to the EEOC and it said Cain Bana was

8    there.  Contact him.  And her explanation to you was,

9    oh, you asked me if Cain Bana was at the store.

10   That's not what I asked.  I asked was Cain Bana

11   there, and she knew what I meant.

12           And after and during her employment, she

13   never did contact her RD, co-worker relations hotline

14   or Global Compliance.  Why not?  If all these bad

15   things were truly happening, why wouldn't you call

16   somebody internally?

17           Her only complaint, and she admitted this

18   on the stand, when she talked to the EEOC

19   investigator, Mayfield, her only complaint during her

20   entire tenure was that Russ Kasper, if customers

21   would say, hey, did she used to be a he, Russ Kasper

22   would say yes.  So who did she go and complain to?

23   The very person the EEOC is saying is the mastermind

24   of the plot.

25           And what did he do?  Once again, here's

1   where their case goes off the tracks but off the

2   cliff.  The guy who wants to get rid of her turns

3   around, immediately contacts Dave Leavengood, and you

4   heard Dave Leavengood by video, the regional

5   director, that, yeah, Jason Carnahan let me know

6   about it and he talked to Russ Kasper.

7           And, according to Ms. Kerr's own testimony,

8   Carnahan, the mastermind of this alleged sixteen

9   month plot, told Kasper that's her business.  Knock

10  it off.  And, more importantly, Ms. Kerr admitted to

11  Investigator Mayfield at the EEOC, the EEOC

12  investigator, that was her only complaint.  That

13  after she complained to Carnahan, Kasper stopped.  He

14  didn't make any more comments, and that was her only

15  complaint.  Plain and simple, ladies and gentlemen.

16          And, finally -- I'm just about wrapping

17  up -- Ms. Kerr testified and the EEOC tried to

18  rehabilitate her, but it just didn't happen.  I said,

19  Ms. Kerr, you say you do a lot of these Sunday

20  deliveries and you volunteer, right?  Yes.  And you

21  wouldn't get paid, right?  And she said yeah.  I

22  said, you have to say that because otherwise there

23  would be time records of these Sundays, and she said

24  yeah, you're right.

25          And I said one of the Sunday deliveries

1    you're saying you did was in the summer of 2014, a

2    delivery to a fair.  I think you may all remember

3    this question.  She was on the stand, and I said, Ms.

4    Kerr, can you explain to the jury this.  If the

5    EEOC's theory is that the best plot that Mr. Carnahan

6    and Mr. Morris could come up with is to give you

7    authorization to do a delivery on Sunday, give you

8    the keys on Saturday, do a delivery on Sunday, if you

9    did a summer of 2014 delivery to the fair, obviously

10   that would have had to be before July.

11           The podium was turned this way.  I said,

12   can you explain to the ladies and gentlemen, then, if

13   that's the plot to get rid of you, to give you the

14   keys on Saturday to let you go do a Sunday delivery,

15   why didn't they fire you when you did this alleged

16   summer of 2014 delivery to the fair, and she could

17   not answer that.

18           Mr. Shultz later said -- I withdrew the

19   question.  He was wrong about that.  That's the

20   question I withdrew because she couldn't answer it.

21   She sat up there, and I just said question withdrawn.

22   How do you answer that?  If they wanted her gone, why

23   wait till July?  By her own admission, she says she

24   did a Sunday delivery in the summer of 2014.  If

25   that's the plot, then fire her then.

1           I'll submit to you there was no delivery in

2    the summer of 2014 and there were no other Sunday

3    deliveries that she did.  But that's her story and

4    testimony.  So it doesn't make any sense.

5           Ladies and gentlemen, this case boils down

6    to one question.  Question Number 1, that's what this

7    case boils down to, I submit to you.  Was Megan

8    Kerr's transgender status a motivating factor in

9    Rent-A-Center's decision to discharge her?  Answer,

10   yes or no.

11          Ladies and gentlemen, Rent-A-Center submits

12   that the overwhelming evidence is no.  The answer to

13   that question is a resounding no.  How do you explain

14   ninety-six other people -- they haven't even touched

15   that -- ninety-six other people that were terminated

16   for the same thing, Raymond Paine, and all they can

17   point to is Holly, a guy who self reported, and Greg

18   Cannon.  I mean, Cannon was fired.  And Mr. Moreland,

19   who they try to say was allowed to work an extra week

20   but clearly everyone in this courtroom knows, I

21   submit, that his last day was the same as Harding's.

22   They let him work out the rest of the day.

23          Ladies and gentlemen, the answer to

24   Question No. 1 is no.  And I would ask you to answer

25   no based on the evidence, but along with that answer

1    no, based on the evidence, lift that cloud of

2    bigotry, lift that cloud of bigotry that's been

3    hanging over their heads for four years.  Lift the

4    cloud of being a liar that's been hanging over

5    Ms. Reeves' head for four years.  Clear their names.

6    Clear their names.  Thank you, ladies and gentlemen,

7    for your time.

8              THE COURT:  Mr. Mulaire, rebuttal?

9              MR. MULAIRE:  Yes, your Honor.  Good

10    morning again.  So Mr. Trusevich said that I haven't

11    touched a couple of things.  I'm here to touch a

12    couple of things now.

13              First of all, they talk about the time that

14    Ms. Kerr was the interim store manager in between

15    Morris and, excuse me, in between Kasper and Morris.

16    Let's think about that for a moment.  Remember, the

17    Rent-A-Center store, this is not like a store with

18    thirty employees in it.  There are four people in the

19    store.  There's the store manager, there's the two

20    assistant managers, and there's an account

21    representative.

22              So the store manager is fired.  There's

23    only two managers in the store to choose from to then

24    run the store.  That would be Ms. Reeves and there

25    would be Ms. Kerr.  Mr. Morris told you himself

1    that -- and, actually, I apologize.  I think it was

2    Mr. Morris.  Either Mr. Morris or Mr. Carnahan said

3    Ms. Reeves had never even been trained on the sales

4    position.  That's their explanation for the reason

5    why the two of them were switched, remember?

6              So if you have one employee in the store,

7    Ms. Kerr, who Mr. Morris had said is the best person

8    in the store and she is trained on both things, then

9    who else are you going to put in charge of the store?

10   The customer account representative?  He's not even a

11   manager.  So that's kind of a weak explanation.  They

12   needed somebody to be in charge, and she was the best

13   person available.

14             Now, related to that, by the way, I want to

15   show you something in their position statement.  We

16   talk about how, you know, as soon as Mr. Morris

17   arrived at the store, as soon as Mr. Morris arrived

18   in the store in February the store started winning

19   awards and you saw the plaques waved around.

20             Well, let's look at when Mr. Morris

21   started.  So again this is Exhibit 1.  This is the

22   company's position statement, their statement to the

23   EEOC.  And, according to this, company says that

24   Jason Morris started February 13th.  There's only

25   twenty-eight days in February.  So he was only on the

1    job for about two weeks in February.  So if the store

2    is winning an award in February for sales, the person

3    who's responsible for that is probably the person who

4    just got finished being in charge of the store for

5    two months.

6         They didn't give the plaque to Ms. Kerr,

7    they gave the plaque to Mr. Morris, though.  So

8    there's really five months between when Mr. Morris

9    arrives and when Ms. Kerr is discharged.  That's the

10   period you should focus on.

11        Now, couple of other points quickly.  First

12   of all, as I said earlier, and I won't belabor the

13   point, they want to talk a lot about people who

14   aren't Jason Carnahan.  There was a very long portion

15   of Mr. Trusevich's closing just now that was all

16   about Elena Reeves.

17        We have no beef with Elena Reeves.  I'm

18   sure she's a good person.  She's in a little bit of a

19   difficult position.  She still works there.  But

20   Elena Reeves didn't fire Ms. Kerr.  We're not

21   accusing her of anything.  So it's a little bit of a

22   straw man when they get up here and say how wonderful

23   Elena Reeves is.  Sure, no complaints.  This case

24   isn't about Elena Reeves.

25        Now, remember you've been instructed that

1   what the lawyers say is not evidence, and that's

2   absolutely true.  So you should be remembering what

3   the testimony was and you should look at what's in

4   the exhibits.  And if what I'm saying is consistent

5   with that, then that's fine.  If what Mr. Trusevich

6   is saying is consistent with that that's fine, but

7   just because a lawyer says something doesn't make it

8   true.

9          Now, they said this in their opening and

10  they said this again at the closing that the two

11  items of furniture that Ms. Shumate purchased, that

12  Ms. Kerr gave her a discount.  You may remember that

13  from the opening and Mr. Trusevich just mentioned

14  that again.  There was no evidence of that

15  whatsoever.  It was used furniture, so it cost less

16  than new furniture.  That's the thing that was

17  testified about.  So when they throw this out there,

18  no, Ms. Kerr gave her a discount.  No witness said

19  that.  There's no document that says that.  That's

20  just something that they're putting out there hoping

21  you won't notice there's no evidence of it.

22          I'm not going to get very far into there's

23  this argument about Amber Shumate's name and the fact

24  that her nickname Amy appeared on the sales receipt.

25  Who cares.  I mean, if you walk into a store and you

1    give -- you walk in and go I'm Amy and you give

2    someone your name as Amy, I really don't understand

3    what that proves.  Shumate is her married name now.

4    Wilkerson was her name then because she wasn't

5    married at the time, so it's really not clear how the

6    fact that Wilkerson appeared on that record is

7    somehow proof of anything either.  So I think that's

8    all I'll say about that.

9           Now, they say how unfair it was for us to

10   say that the daily activity planner was thrown out

11   and they had no idea until years later that that, you

12   know, there's going to be anything involving the

13   daily activity planner that might be at issue.

14          Remember, their explanation for why Ms.

15   Kerr was fired is misuse of a delivery vehicle.  If

16   you're firing somebody for misuse of a delivery

17   vehicle, wouldn't you save your delivery records?  So

18   it's not that they need to be told by somebody else,

19   hey, maybe this would be a good idea.

20          But even if they were, remember, we didn't

21   put in any evidence about this unemployment

22   application that Ms. Kerr made, but they did, so you

23   have some evidence about it thanks to them.

24          And we know that as soon as August of 2014

25   there was an application for unemployment insurance.

1    And you can see that, I mean, this stuff was raised

2    in there.  So they already knew in August, and that

3    would have been the same daily activity planner,

4    July, August, September, that's all one quarter, so

5    midway through that same DAP they would already know,

6    okay, she's disputing the circumstances of her

7    discharge.  So they knew before they threw that out

8    that there was a dispute about that but they threw it

9    out anyway.  We didn't need to tell them that.

10           I'm not going to talk very long about the

11   Illinois Department of Employment Security forms.

12   Mr. Trusevich referred a couple of times not to the

13   adjudication summary, which is what I put on the

14   screen earlier, but you'll see in that exhibit there

15   are two other forms, complaint forms, which Ms. Kerr

16   did fill out.

17           And you should look at those for

18   yourselves.  I would submit to you that they're not

19   inconsistent with the gist of what Ms. Kerr has been

20   saying all along.  There's a little bit of spin

21   that's been put on them.  You should look at them for

22   yourselves.  They're not different from what we're

23   claiming Ms. Kerr has said.

24           There was also -- this is another thing

25   where you need to focus on what the evidence is and

1    not what lawyers say.  We heard repeatedly from the

2    other side that Mr. Kasper's claims that roughly

3    every week he was being called by Mr. Carnahan.  You

4    may remember, Mr. Kasper's testimony was that it was

5    about every month or maybe every six weeks.  So

6    that's kind of a little exaggeration.  It's not from

7    evidence.

8         Now, our complaint, to be fair, the

9    complaint, that's the thing that the EEOC filed in

10   2016, that says roughly every week but, again, the

11   EEOC is not a witness here.  The complaint is not

12   evidence.  It's an exhibit, but the complaint is just

13   an accusation.  Mr. Kasper's testimony is the

14   evidence.  You should listen to the evidence.

15        And with respect to Mr. Kasper's

16   performance and improvement plans, which I believe

17   were just characterized as a chance to improve, yeah,

18   I think it's fair to look at the percentage increase

19   that, you know, Mr. Kasper was being asked to do for

20   sales because he was being asked to increase sales

21   dramatically in as little as eleven or three days.

22        And, again, it only became an issue with

23   his sales in the store after he started objecting to

24   what Mr. Carnahan is asking him to do.  So the

25   circumstances of that are suspicious.

1            Now, we also heard again this anecdote that

2    when Mr. Kasper was about to be fired or when

3    Mr. Carnahan arrived on the day that Mr. Kasper was

4    going to be fired that Mr. Kasper was trembling.  And

5    all I'll say is you saw Mr. Kasper.  Does he look

6    like the sort of individual who's likely to tremble

7    about anything?  So I think the picture that's being

8    painted there is a little bit distorted.

9            The ninety-six people.  So Ms. Bell

10   conveniently came and told us that, oh, over some

11   period of years we found ninety-six people, out of

12   the twenty thousand people they employ at any one

13   time, who were also fired under this policy.  Well,

14   first of all, out of twenty thousand people, that's

15   not a whole lot.

16           Remember, Mr. Carnahan himself said he had

17   never written anybody up for violating this personal

18   vehicle use policy in the eighteen years that he had

19   been there up until Ms. Kerr.  So when they say

20   ninety-six, it sounds like an impressive number at

21   first but that's out of a gigantic company over a

22   period of years.

23           It's also true, we have no information

24   about, you know, what other Hollys and Morelands are

25   there out there from the rest of the country.  That

1    ninety-six is apparently a nationwide figure.  We

2    know about Holly and Moreland from here in Central

3    Illinois, but how many people are out there who

4    weren't fired or given a verbal warning like Holly.

5    We just don't know.

6            And an important thing to note, we don't

7    have to prove that they never fire people for this.

8    That's not our claim.  The claim is it's not an

9    automatic termination the way they set it out.  It's

10   not no exceptions.  There are other -- the company

11   takes things into consideration.

12           So to the extent that their explanation is

13   there are no exceptions, the reason we point to

14   Moreland and Holly is to show that that's not true,

15   not to show nobody ever gets fired for this.  We

16   don't have to do that.  Ultimately the question is

17   why was Ms. Kerr fired, and we're just rebutting the

18   explanation that they've given.

19           Now, they also say that Mr. Carnahan could

20   have fired the whole store.  I'm not really sure how

21   that would have been a better plan because if you're

22   trying to do something quietly, probably firing a

23   large group of people wouldn't be the way to go about

24   that.  But, you know, again, we don't need to prove

25   what Mr. Trusevich just said, that Mr. Carnahan would

1   do anything to get rid of Ms. Kerr.  We don't need to

2   show that.  We just need to show that he wanted her

3   gone.

4          There was a comment about whether Ms. Kerr

5   referred to her now spouse as a spouse in September

6   when she wasn't a spouse.  There was all that.  I

7   want to -- well, I won't show you, but I just want to

8   remind you of one set of jury instructions that you

9   were given, and that is that you're supposed to

10  distinguish between an important fact and unimportant

11  details.

12         So you've been told that when there is some

13  kind of difference like that you should consider

14  whether it was simply an innocent error or an

15  intentional falsehood, and whether it concerns an

16  important fact or an unimportant detail.  I would

17  submit to you that a lot of what you've been hearing

18  about are unimportant details.

19         Is Ms. Kerr wrong about where the furniture

20  was picked up on that Sunday?  Was it a mini storage

21  as opposed to Ms. Shumate's mother-in-law's house?

22  Maybe she remembered that wrong.  Okay.  That's not

23  the question in this case.  The question isn't where

24  was the furniture picked up from.  The question is

25  why was she fired and did Jason Morris give her

1    permission for that delivery, wherever it started

2    that day.

3              So that's where I would ask that you please

4    distinguish between what are the details that

5    actually matter for answering questions on the

6    verdict form and what are other things that, yeah,

7    maybe Ms. Kerr got them wrong, maybe another witness

8    got them wrong, but they're not details that actually

9    matter for why we're here.

10             Ms. Kerr may not be a perfect person.

11   Maybe her memory is not very good about that.  We

12   don't have to prove that she's a perfect person.  The

13   law protects everybody, not just perfect people.  Not

14   just people with perfect memories.

15             With respect to Ms. McCallister, the only

16   real thing they had to say with respect to that was,

17   oh, well, Ms. McCallister said that, you know, she

18   wouldn't have been there the Sunday before and the

19   Sunday after.  And I guess the suggestion there is

20   that now they're saying, well, maybe Ms. Kerr used

21   the vehicle the Sunday after July 20th or the Sunday

22   before July 20th, which is yet a new explanation.

23   There's zero evidence of that whatsoever.

24             Remember, their claim in this case or their

25   defense in this case is that Ms. Kerr was using it on

1    July 20th for personal reasons.  So I don't know if

2    this is an effort to change the story now, but there

3    is zero evidence that anything happened the weekend

4    before or the weekend after.  And for that matter the

5    weekend after she'd been fired, so I doubt that she

6    even had access to the Rent-A-Center truck.  So that,

7    I would submit to you, is a fairly weak argument.

8            You know, and there were a lot of

9    assertions made about what was and wasn't in the

10   charge of discrimination.  That's the administrative

11   charge that is an exhibit and the intake

12   questionnaire.  And all I would say there is the

13   evidence that you're supposed to decide the case on

14   is the evidence that you hear about at trial this

15   week.

16           As I said before, there's a lot of stuff

17   that comes before.  We have not tried to explain to

18   you all the procedures of what happens during an EEOC

19   investigation, what are you supposed to put in the

20   charge, what are you supposed to put in the intake

21   questionnaire.  There's no evidence about any of

22   that.  You've been asked to make some assumptions

23   about should everything, every last detail, be in an

24   intake questionnaire, but those are just assumptions

25   that you're being asked to make.  The evidence in

1    this case is what was presented to you this week.  We

2    haven't told you anything about how the intake

3    questionnaires work, what you're supposed to put in

4    the charge, any of that, so you shouldn't put much

5    weight on that.  You should put weight on the

6    evidence.

7             So in conclusion, at the end of the day,

8    Ms. Kerr, again, was a good employee.  There's no

9    dispute about that.  And she worked there for almost

10   a decade, and the evidence shows that they wanted to

11   get rid of her because of who she is.  If Ms. Kerr

12   wasn't transgender, she wouldn't have been fired and

13   we wouldn't be here.  Rent-A-Center broke the rules

14   and we ask that you hold them accountable.

15            So we thank you again for your time and

16   attention, and ask that you return a verdict in favor

17   of the EEOC.  Thank you.

18                 THE COURT:  All right.  Thank you

19   both.  Ladies and gentlemen of the jury, you will now

20   retire to the jury room to deliberate.  You must

21   first select a presiding juror.  The presiding juror

22   will preside over your deliberations and will be your

23   representative here in court.  The forms of verdict

24   have been prepared for you and you have those with

25   you.

1          When you have reached a unanimous agreement

2     on the verdict, your presiding juror will fill in and

3     date the appropriate form and all of you will sign

4     it.  Even though you have eight copies of the

5     instructions, you only need to complete and sign one

6     form.  Madam clerk, will you please swear in our

7     court security officer.

8                    (Officer sworn.)

9               THE COURT:  Ladies and gentlemen, you

10    may now retire to the jury room to deliberate.

11               (The following was held outside the

12    presence of the Jury.)

13               THE COURT:  It's my understanding that

14    you all worked through which exhibits would go back

15    yesterday afternoon.  And so, Shannon, if you would,

16    make sure those exhibits are delivered to them as

17    soon as we break here.

18          If there are any questions, it's the jury's

19    responsibility to put those in writing and submit

20    them to me.  I will then call all of you back

21    together, and we will review the question as a group

22    and my practice is to prepare a written response in

23    all circumstances that we possibly can.  So it's only

24    the rare circumstance that we will bring them back in

25    to answer orally.

1          So make sure that Shannon has your cell

2    phone numbers.  I assume, it's 11:30, you'll all

3    probably put some things away and then go to lunch,

4    but make sure you have your -- we have your cell

5    phones so that we can contact you promptly.  Don't go

6    far, because we do want you to come back within about

7    five or ten minutes after we call you.  All right.

8    So stay close, and that's what we'll do.  Anything

9    from either of you?

10          MR. TRUSEVICH:  Just to let you know,

11   Judge, we'll just be in the room across the hall.

12          THE COURT:  That works well if we've

13   got it already reserved.  I'm sure you figured out by

14   now there's a handful of restaurants that deliver and

15   so that's what we'll do.  Okay.  We'll stand in

16   recess until we hear something from the jury.  Thank

17   you.

18          (Court in recess at 11:36 a.m.)

19

20

21

22

23

24

25

118

```
 1   STATE OF ILLINOIS  )
                        )
 2   COUNTY OF CHAMPAIGN)

 3

 4            I, Janet E. Frederick, a Certified

 5   Shorthand Reporter, in and for the County of

 6   Champaign, State of Illinois, do hereby certify that

 7   the foregoing is a true record of the proceedings had

 8   in the above-captioned matter.

 9            I do hereby certify that I am a

10   disinterested person in this cause of action; that I

11   am not a relative of any party or any attorney of

12   record in this cause, or an attorney for any party

13   herein, or otherwise interested in the event of this

14   action, and am not in the employ of the attorneys for

15   either party.

16            IN WITNESS WHEREOF, I have hereunto set my

17   hand this 24th day of May 2018.

18

19

20

21                    _____
                      JANET E. FREDERICK, CSR
22

23

24

25
```